THE STATE OF OHIO, APPELLEE, *v.* HECTOR, APPELLANT.

---

*This decision was made after the death of JUSTICE ZIMMERMAN and before the appointment of a successor.

168

(No. 68-689—Decided July 30, 1969.)

*Mr. Melvin G. Rueger*, prosecuting attorney, *Mr. Calvin Prem* and *Mr. Carl Vollman*, for appellee.

*Mr. Harvey B. Woods* and *Mr. Vernon R. Brose*, for appellant.

LEACH, J. Among the many assignments of error advanced herein are the claims that the trial court erred:

(1) In admitting into evidence over objection the testimony of (a) a taxicab driver describing an armed robbery in which he was the victim which occurred on the streets of Cincinnati at about 2:55 a. m. on November 4, 1967, and identifying defendant as the robber, (b) witnesses describing an armed robbery of a grocery store in Cincinnati and the shooting of the proprietor which occurred between 6:30 and 7:00 p. m. on November 4, 1967, and identifying defendant as being the gunman, and (c) another taxicab driver describing an armed robbery occurring on the streets of Cincinnati at approximately 9:30 p. m. on November 7, 1967, and identifying defendant as being the robber.

(2) In refusing to permit defense counsel to cross-examine a witness for the prosecution as to whether, at the time of his testimony, he was under indictment charging three armed robberies and shooting to kill, including an indictment for the November 4, 1967, grocery store holdup (as to which witnesses had identified defendant as the perpetrator).

We conclude that the trial court did err to the prejudice of the defendant in these respects and, thus, that the judgment of conviction must be reversed and a new trial ordered.

In order to place the problem relative to such errors in proper focus, we will first make abbreviated reference to the basic facts in evidence at the trial.

There was no dispute as to the fact that in the early hours of daylight on November 10, 1967, and during the course of a robbery at the office of the Fifth Street Cab Company in Cincinnati, one Walton P. Garrett was shot and killed. The exact time of the killing was estimated by

170

witnesses to be at approximately 6:55 a. m. During the course of the robbery one Grover Lawrence was shot, but not killed.

The major question at trial was one of the *identity* of the killer. Defendant was arrested on November 26, 1967. Trial was had, beginning on April 29, 1968, and was concluded on May 9, 1968.

At the time Garrett was shot, Stanley Blackwell, the cab company owner, Tommy Green, the night dispatcher, Grover Lawrence, a driver who had already been shot, Harry Thomas, another driver, and Deloris George, the day dispatcher, were present. At the trial, defendant was identified by Blackwell, by Green and by Thomas as being the killer. No inquiry was made of Miss George as to the question of identification. Lawrence's testimony was to the effect that defendant "could have been him, for all I know"; and that he "didn't pay much attention to the man because I was shot too quick"; that "he ain't the man"; and that "I don't think he is the man." Blackwell, Green and Thomas had previously identified defendant after viewing him in a lineup at the police station following his arrest on November 26, 1967. (Defendant had specifically consented to participate in the lineup, and no claim is made that any of his constitutional rights were violated thereby.)

Defendant claimed that at the time of the killing he was at the home of his girl friend, Yvonne Powell. Testimony to this effect was given by the defendant, and by the mother and young sister of the girl friend. It also was given (by deposition, the witness being unable to attend the trial) by the girl friend, but she admitted that she had made prior statements to the police and to the grand jury to the effect that defendant had told her he had killed a man at the cab company. However, she denied that the prior statements were true, and asserted that they were only given after the police had told her the defendant had confessed.

The only eye witnesses who attempted to describe the gun used in the killing were Green, who described it as

looking like a .38, a "big stub nose gun," and Thomas, who described it as "a .32 or .38 * * * I didn't know what make it was." No gun was ever found.

One Curtis Binion testified that he had been with defendant the night before, and until between 3:30 and 4:00 a. m. on November 10, 1967, at which time he had dropped defendant off at an "after hours place"; that defendant later came to Binion's home, located near the cab company, between 7:00 and 7:30 a. m. asking Binion to drive defendant to Yvonne Powell's home; that Binion drove defendant to Yvonne's home and later returned and picked up defendant there at about 8:15 to 8:30 a. m.; that at that time, on the way downtown, defendant pulled a bag from under the seat of Binion's car, told Binion that he had "took off" (robbed) a place the night before, and told Binion to get rid of the articles. Included in the bag, according to Binion, was a .22 caliber pistol, which, Binion testified, had been borrowed by defendant from one Frankie Nowell.

The testimony of Binion was that he later threw the bag and its contents into the Ohio River from a railroad bridge.

Frankie Nowell testified that he owned a .22 caliber revolver with a "real long barrel," that "looks like a .38," and that he loaned the gun to defendant and never got it back.

While the coroner's pathologist testified that three projectiles were recovered from the body of Garrett (he was shot four times), there was no testimony as to their size or caliber.

Over objection by the defense, the court permitted prosecution testimony by Herbert Moore, a cab driver, that in the early hours of November 4, 1967, he picked up a fare and drove him to Jay Street; and that when they arrived there, at about 2:55 a. m. the fare "come out with a pistol" and took from him approximately $70. Moore did not describe the pistol. In court, he pointed out defendant as the man who held him up, and stated that he had not seen him since the time of the holdup until he saw

him in court, but that he had previously identified a picture of defendant out of a group of six or seven pictures brought to him by detectives.

Over objection by the defense, testimony was permitted by Lester Meyer and Betty Jo Moses concerning an armed robbery of a grocery store located on Woodburn Avenue, in which Meyer had been shot. This occurrence took place on November 4, 1967, between 6:30 and 7:00 p. m. Meyer testified that the gunman came into his store, picked up two cans of beer, came back to the counter, mumbled something, then pulled a gun and said he would kill Meyer, at which time he fired a shot, which "glanced me up at the head"; that Meyer reached for the gun and was shot through the wrist; and that Meyer then started to the back of the store at which time he was shot through the back. In court, Meyer pointed to defendant as his assailant, and testified that he had seen and identified the defendant at a lineup at the police station on November 27, 1967. No description of the gun was given and no evidence was presented attempting to prove any similarity between any projectiles which might have been removed from the body of Meyer and the three projectiles taken from the body of Garrett.

Betty Jo Moses, a 14-year-old girl, testified over objection that she had seen the "man seated at the counsel table here" (the defendant) at the grocery store the evening of November 4, 1967; that she saw him come in and go to the beer case and get some beer; that she then left the store and heard three shots; and that the man then ran out of the store and got into a "grey T-Bird."

Charles Story, another cab driver, over defense objection, testified that on November 7, 1967, at approximately 9:30 p. m., he picked up a fare at the Greyhound Bus Station and took him to Helen Street; that the fare sat in the front seat; that when they arrived at the designated destination, the fare paid him with a bill requiring the witness to make change; that the fare opened the door and started to get out, but then "wheeled back with a gun in his hand," took Story's money amounting to about $78, and

got out and told Story to "head up the street." Story described the gun as "something that looked like a .38," with "a long barrel."

By way of rebuttal evidence, one Richard Blackford testified for the prosecution. When defendant testified, he had denied, on cross-examination, knowing any Richard Blackford, and had denied ever making any statement to Blackford at the Round One Cafe admitting the shooting of Garrett. Blackford testified that he had known the defendant for about eight months, and that on November 11, 1967, he was in the Round One Cafe and saw defendant there. In answer to the prosecutor's question, "Did you ask him why he shot that fellow at the Fifth Street Cab Company, and did he say, 'The bastard had no business trying to grab my gun,' " Blackford, after objection by the defense had been overruled, responded, "Yes, he did."

Blackford testified further that on November 4, 1967, he had made arrangements to go with defendant and a man named Bell to Meyer's Delicatessen on Woodburn Avenue, but that he did not go. He was asked by the prosecutor as to whether he knew the "owner of a 1961 Thunderbird," and responded that he did. No further evidence was adduced relative to either the ownership or color of the Thunderbird.

Blackford testified on direct examination that he was presently confined in the Hamilton County Jail. On cross-examination, the question was asked, "Now, you are presently in the Hamilton County Jail as a result of an indictment for three armed robberies, shooting to kill?" Objection to this question was sustained by the court. In further cross-examination, Blackford was asked whether the prosecutor had made any promise to him or whether he expected any favoritism by his testimony, and answered, "None whatsoever." The next question was whether he had been indicted for an armed robbery that occurred on August 28, 1967, to which objection was made and sustained. The next question was whether he had been indicted for an armed robbery on November 4, 1967, of a delicatessen on Woodburn Avenue involving Lawrence Bell and himself.

174

Objection was made and sustained, with the court instructing counsel for the defense that he had ruled on the nature of that type of question and instructing him to desist. The court instructed counsel that he was limited to asking a witness whether he had been *convicted* theretofore, and could not inquire if he were *indicted.*

## I.

The state maintains that the evidence describing the armed robbery of a taxicab driver the morning of November 4, 1967, describing the armed robbery and shooting at the grocery store the evening of November 4, 1967, describing the armed robbery of a taxicab driver the night of November 7, 1967, and the courtroom identification of defendant as being the perpetrator of these offenses were admissible under the language of Section 2945.59, Revised Code. This statute reads:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

This statute has been held to be merely declaratory of the well settled common-law rule making admissible certain evidence of other like acts. *Clyne* v. *State* (1931), 123 Ohio St. 234, 236; *Russo* v. *State* (1933), 126 Ohio St. 114, 117.

The common-law rule, however, does not allow the admission into evidence of proof of other like acts merely because such proof shows a trait, disposition or propensity toward the commission of crime. With certain exceptions, not applicable to armed robbery cases, this is true, even where the proof may show a propensity to commit a type or class of crime. The average individual is prone to much more readily believe that a person is guilty of the crime

charged if it is proved to his satisfaction that the defendant has committed a similar crime. To guard against that evil, the general rule forbids the introduction of any evidence tending to show that the accused has committed any crime wholly independent of that offense for which he is on trial. 22A Corpus Juris Secundum 729; 29 American Jurisprudence 2d 366; 1 Wigmore on Evidence (3 Ed.), Sections 193 and 194; 1 Underhill's Criminal Evidence 447.

This philosophy, while alien to the Continental system of criminal justice, is a fundamental part of our Anglo-American criminal jurisprudence.

Exceptions to this rule are made where the prior offense is part of a common plan or scheme or where it tends to prove motive, intent, knowledge or identity, not *because* the prior acts prove that defendant is crime prone, but *in spite of* such fact. Such exceptions to the rule are made on the theory that the circumstances involved in the prior offense or offenses comprise substantial probative evidence of guilt of the particular offense in question, and the *incidental* fact that this same evidence proves another crime does not stand in the way of receiving such evidence for its permitted use.

The case law applying this principle to the never ending complexities of human conduct is myriad. See 22A Corpus Juris Secundum 729-911; 29 American Jurisprudence 2d 366-382; 1 Underhill's Criminal Evidence 447-507.

To be admissible, such evidence must be relevant to some issue of proof of guilt of the particular crime in question. Proof of a prior armed robbery by a defendant is not, per se, admissible evidence in the trial of a defendant for a later armed robbery. It may or may not be admissible, depending upon the probative value of such evidence as proof of an issue in the case being tried. In a prosecution for robbery, admission of evidence showing or tending to show that defendant had been guilty of other robberies, if not justified under any of the exceptions to the general rule of inadmissibility of evidence of extraneous crimes, is clearly prejudicial and constitutes reversible error. See annotation, Admissibility in robbery prosecu-

tion, of evidence of Other Robberies, 42 A. L. R. 2d 854, 887.

A review of the decisions of this court indicates that in the interpretation of the common-law rule, before the enactment of the Ohio statute in 1929 and in the interpretation of the statute since then, these basic principles have been applied. The cases prior to 1928 are reviewed in the opinion of Marshall, C. J., in *Whiteman* v. *State* (1928), 119 Ohio St. 285. See, also, *Beckman* v. *State* (1930), 122 Ohio St. 443; *Clyne* v. *State, supra* (123 Ohio St. 234); *State* v. *Moore* (1948), 149 Ohio St. 226; *State* v. *Cochrane* (1949), 151 Ohio St. 128; *State* v. *Shively* (1961), 172 Ohio St. 128; 15 Ohio Jurisprudence 2d 520-539.

It will be noted that Section 2945.59, Revised Code, refers only to motive, intent, absence of mistake or accident, scheme, plan or system, and does not contain the word "identity."

In *Whiteman* v. *State, supra,* the second paragraph of the syllabus holds:

"Where other offenses of like character are committed by the same persons in the same locality within a period of time reasonably near to the offense on trial, *and where the same plan, system and methods are followed,* testimony of such other offenses is relevant to the issue of *identity.*" (Emphasis added.)

However, to make such other evidence relevant to the issue of identity, the evidence must reflect that essentially the *same* plan, system or methods have been followed. As stated by Chief Justice Marshall, at page 294 in *Whiteman*: "Just as individuals are known and recognized by their physical and mental characteristics, so criminals are discovered in many instances by certain characteristics, plans, and methods followed in the commission of offenses."

In *Whiteman,* the evidence admitted clearly met this test. The facts of that case are set out at page 287:

"All of the victims of the three alleged robberies, five in number, testified, and each of the five positively identified the two defendants as the robbers, and all five witnesses, in describing the different occurrences, were in

practical agreement in describing the clothing and uniforms worn by the defendants, the manner of their executing the different robberies, the agencies employed, and perhaps other characteristics which were true of each and all of the alleged robberies. All of the alleged robberies occurred in one neighborhood and within a radius of a mile and a half. An automobile was employed by the robbers, and only two persons were in the automobile. They were dressed in uniforms of bus drivers. They carried guns and flash-lights. Their plan was to drive their car next to that of their victims and compel them to stop. They would then impersonate officers, and cause the victims to leave their cars, and then search and rob them. * * *''

The legal determination, by comparison of the plan, system or method employed in a prior crime with the plan, system or method employed in the crime in question, of whether the former is relevant to the issue of identity of the perpetrator of the latter, must be made without consideration of the fact that eyewitnesses have identified the same person as the perpetrator of both crimes.

There must be some similarity of methodology employed which *itself* would constitute probative evidence of the probability that the same person (whoever he might be) committed both crimes. In such event, eyewitness proof of the identity of the perpetrator of the prior offense is relevant proof on the issue of the identity of the perpetrator of the offense in question. Absent such proof, it has no relevancy, and such omission is not supplied by the fact that eye witnesses at the scene of the offense in question identified the same person as the perpetrator of that offense. Cf. *Lancaster* v. *State* (1918), 82 Tex. Crim. 473, 200 S. W. 167, 3 A. L. R. 1533. See, also, 22A Corpus Juris Secundum 756; 29 American Jurisprudence 2d 372; 1 Underhill's Criminal Evidence 495.

For such evidence to be admissible, there must be such a logical connection between the crimes that proof of the one will naturally tend to show that the accused is the person who committed the other. *Boyd* v. *United States* (1892), 142 U. S. 450, 35 L. Ed. 1077, 12 S. Ct. 292.

Applying those principles to this case, we think it is clear that, independently of the common eyewitness identification of the four crimes testified to, there is no proof of any common "scheme, plan or system" within the purview of Section 2945.59, Revised Code. We hold that such evidence was inadmissible, that it violates the general rule of inadmissibility of evidence of extraneous crimes, and thus is prejudicial and constitutes reversible error.

## II.

While ordinarily the credibility of a witness may be attacked by proof of conviction of crime, but not by proof of indictment, this rule is subject to the exception that a witness in a criminal case may be asked if he is under indictment for crime, if such fact would reasonably tend to show that his testimony might be influenced by interest, bias, or a motive to testify falsely. 98 Corpus Juris Secundum 487; 58 American Jurisprudence 410; Underhill's Criminal Evidence 628; 3 Wigmore on Evidence (3 Ed.) 525; McCormick on Evidence, 84; 20 A. L. R. 2d 1440.

In *Keveney* v. *State* (1923), 109 Ohio St. 64, the prosecutor was permitted to ask a witness for the defense questions about a number of indictments pending against him for concealing and obtaining stolen property from several persons, including the defendant then on trial. In the opinion by Wanamaker, J., at page 66, it is stated:

"Of course you cannot impeach a witness by merely showing an indictment, but you may affect his interest in his present testimony, his credibility upon the stand, by showing his mutuality of interest with the defendant in securing his acquittal, which, of course, is a matter directly affecting the weight of his testimony."

This same principle applies to witnesses for the prosecution. In such cases, the courts have held that evidence that criminal charges are then pending in the same court against a witness for the prosecution is a circumstance tending to show that the testimony of the witness is or may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he might be granted immunity or rewarded by leniency in the disposition of his

own case. *Alford* v. *United States* (1931), 282 U. S. 687, 75 L. Ed. 624, 51 S. Ct. 218; *People* v. *Demera* (1923), 64 Cal. App. 121, 220 P. 673; *People* v. *Dillwood* (1895), 4 Cal. Unrep. 973, 39 P. 438; *State* v. *Roberson* (1939), 215 N. C. 784, 3 S. E. 2d 277; *Commonwealth* v. *Mulroy* (1944), 154 Pa. Sup. 410, 36 A. 2d 337; *State* v. *Burpee* (1892), 65 Vt. 1, 25 A. 964, 19 L. R. A. 145.

We hold, therefore, that the trial court erred in refusing to permit defense counsel to cross-examine witness Blackford as to any pending indictments against him. In view of the nature of Blackford's testimony, and in view of the nature of this case, we hold that such limitation of cross-examination was prejudicial to the rights of the defendant.

The judgment of the Court of Appeals is reversed and the cause is remanded to the Court of Common Pleas for further proceedings.

*Judgment reversed.*

TAFT, C. J., MATTHIAS, O'NEILL, HERBERT and DUNCAN, JJ., concur.*

LEACH, J., of the Tenth Appellate District, sitting for SCHNEIDER, J.

---

*This decision was made after the death of JUSTICE ZIMMERMAN and before the appointment of a successor.