THE STATE OF OHIO, APPELLEE, *v.* MCELROY ET AL., APPELLANTS.

[Cite as State v. McElroy (1970), 22 Ohio App. 2d 103.]

(No. 427—Decided April 20, 1970.)

Mr. *James R. Scott,* for appellee.
Mr. *Frank K. Leyshon,* for appellants.

PUTMAN, J. Bobby McCurdy and Albert McElroy were jointly indicted, tried and convicted by a jury and sentenced for having, on October 26, 1968, assaulted Martin Scott, a policeman, by means or force likely to produce great bodily harm, contrary to Section 2901.241, Revised Code.

They assign five errors:

1. That the trial court erred in overruling the motion for new trial on behalf of the defendants.

2. That the trial court erred in admission of evidence, over objection of the defendants, of prior criminal acts.

3. That the trial court erred in admitting evidence, over the objection of the defendants, of prior criminal acts without proper instructions as to the use of such evidence.

4. The trial court erred in not instructing the jury as to trespass in its general charge, such instruction having been requested by the defendants.

5. The court failed to charge in its final charge relative to the law of arrest after such charges were requested by the defendants.

The specific claim made in support of the first assignment of error is that the verdict is not sustained by sufficient evidence and is contrary to law. This assignment of error is not well taken.

It was uncontroverted that the victim was a Cambridge city police officer on duty at about 3:40 in the morning investigating a disturbance and, in that connection, contacted a civilian named Shively.

Because it was seriously and strenuously urged that the verdict of the jury was without support in the evidence, we set forth the direct testimony of the police officer victim, Martin E. Scott, as it appears:

"Q. What did you then do, Mr. Scott?

"A. I knocked on the apartment door.

"Q. Now, where is this apartment exactly in relation to the top of the stairs when you come from the outside stairs?

"A. When you come from the outside stairway, there's a storm door and inside there is like a vestibule. There's

another door in which you go through. This apartment is the first one on the right.

"Q. Now, the stairway that comes down from the third floor apartments, where does it come down in relation to the outside door on the stairway?

"A. I do not know.

"Q. Does it come down into the vestibule, if you know?

"Mr. Leyshon: Objection, your Honor. He's already said he doesn't know.

"A. No, sir.

"The Court: Overruled.

"Q. Mr. Scott, what happened when you knocked on this apartment door?

"A. I knocked on the apartment door and Mr. McElroy answered the door.

"Q. And had you heard any conversation or could you hear any conversation, before the door was opened, coming from this apartment?

"A. No, just noise.

"Q. What kind of noise did you hear?

"A. Music noise.

"Q. Did you hear any conversation as well as music?

"A. No, sir.

"Q. And what did you then do when Mr. McElroy opened the door, or what happened?

"A. He asked me what I wanted and I advised him that I'd had a complaint from a tenant in the same building that this disturbance was going on and we would like it to be quieted down.

"Q. And what then happened?

"A. Then Mr. McElroy invited me into the aprtment and, at this time, I could see where the noise was coming from.

"Q. Where was it coming from?

"A. It was coming from a radio that was sittin' on a desk, which would be the east side of the room, far east side.

"Q. And who was in the apartment, Mr. Scott?

"A. In the apartment, at the time I went in there,

was Mr. McElroy, Mr. McElroy's wife, Mr. McCurdy and Mr. Masters.

"Q. And where did Mr. McElroy go after you had the door opened for you?

"A. He went into the kitchen which adjoins the living room, and I followed him to the kitchen. I stopped at the doorway of the kitchen and the living room.

"Q. Did Mr. McElroy have any conversation with you about the radio at the time he opened the door?

"A. No, sir.

"Q. And what happened then, Mr. Scott?

"A. There was no attempt to turn the radio down so I advised him again that he would have to turn the radio down.

"Q. And what happened then?

"A. Mrs. McElroy spoke up and asked, 'What does he want?' And Mr. McElroy told her, 'He wants the radio turned down.'

"Q. And then what happened?

"A. She looked at me and stated, 'Turn the damn radio down yourself.'

"Q. And what did you do?

"A. I advised them if, unless there was action taken in turning this radio down and also quieting themselves, that I would file charges for disturbing the peace.

"Q. And then what happened, Mr. Scott?

"A. I was hit in the face by Albert McElroy and knocked from where I was standing to the bed that is in the living room.

"Q. And then what happened?

"A. As I started to come off the bed, I pulled my slapjack to defend myself, at which time I was grabbed around the neck by Albert McElroy and disarmed of my slapjack.

"Q. Was there any other parties at that time involved with you?

"A. Yes, sir. Malcolm Masters also grabbed me, grabbed my right arm, and also Bobby McCurdy stepped in

between them and was getting at me around the face and neck and the chest area.

"Q. When you say he was 'getting to you,' what do you mean, Mr. Scott?

"A. He was joining in with the other two.

"Q. Were you successful in getting your slapjack, or whatever you call this instrument, out of wherever you had it?

"A. Yes, sir.

"Q. And did you, were you able to use it?

"A. No, sir.

"Q. What happened to it?

"A. I was disarmed of my slapjack by Albert McElroy.

"Q. Then what happened, Mr. Scott?

"A. He used it on me.

"Q. And what parts of you?

"A. My neck, my back and shoulders, the left side.

"Q. And at the time Mr. McElroy was using this instrument on you, what were the other two gentlemen doing?

"A. I felt a blow to the groin area. I don't know who did this, but I was just being subdued and was trying my best to get unsubdued.

"Q. As Mr. McElroy hit you with the slapjack, was there anyone holding you?

"A. Yes, sir.

"Q. And who was holding you?

"A. Malcolm Masters.

"Q. And where was Mr. McCurdy at this time?

"A. In the middle of Malcolm Masters and Albert McElroy.

"Q. Was he attempting to stop them from their activities?

"A. No, sir.

"Q. Mr. Scott, at the time this was going on, were there any verbal threats made by any of these parties to you?

"A. Not inside the apartment, no.

"Q. And did you then go out of the apartment after this scuffle took place?

"A. Yes, sir. I was throwed out of the apartment and the three came along with me out into the hallway.

"Q. Now, at this time, Mr. Scott, what was your physical condition?

"A. I was bleeding very heavily from the mouth and nose. I was conscious; I knew what I was doing.

"Q. Where was your slapjack at the time you left the apartment?

"A. I do not know.

"Q. Mr. Scott, how long were you in the apartment, while this scuffle was going on? To the best of your recollection, how long did this take place?

"A. No more than a minute, two minutes at most.

"Q. And were you down on anything besides the bed while you were in there?

"A. On the floor at one instance.

"Q. When you say you were thrown out of the apartment, would you describe how you did leave the apartment, to the best of your recollection?

"A. I went out the same way I'd went in—backwards.

"Q. And did you recover your slapjack at any time after you got out of the apartment?

"A. No, sir, not until it was handed to me by Mr. Shively.

"Q. Did you see it at any time after it was taken away from you?

"A. Yes. I saw it in the hand of Mr. McElroy.

"Q. After you went out the apartment door, Mr. Scott, who did you see out in the hallway?

"A. I saw Mr. McElroy and Mr. Masters and Mr. Mc-Curdy.

"Q. And what did they do when you got out into the hallway?

"A. They held me in a corner of the hallway.

"Mr. Leyshon: Objection, your Honor, because we don't know who 'they' is.

"Q. Who is 'they'?

"A. The three that were in the hallway with me, Mr. McCurdy, Mr. Masters and Mr. McElroy.

"Q. And as they held you in the corner, did any of them make any threats to you?

"A. Not verbal threats.

"Mr. Leyshon: Objection. Leading.

"Q. Any threats of any nature, Mr. Scott?

"Mr. Leyshon: Objection. Leading.

"The Court: Overruled.

"A. I don't know, sir.

"Q. How long did they hold you against the wall in the hallway, Mr. Scott?

"A. Just a short amount of time, a minute or two minutes. Then I heard the door open and I saw Mr. Shively come out of his apartment, at which time, I saw him carryin' my slapjack and he handed it back to me, at which time Albert McElroy released me, and I hit Malcolm Masters in the face.

"Q. And where did Mr. McElroy and Mr. McCurdy and Mr. Masters go at this point?

"A. At this point, they turned and ran back into the apartment.

"Q. And what did you then do, Mr. Scott?

"A. I stood there for a minute and then the door reopened and Albert McElroy threw my hat out and told me that the next time I might get killed.

"Q. Now, at the time he threw your hat out, did he come out the door or just stand in the doorway?

"A. No, sir. The door just opened up very fast and out came my hat.

"Q. And what was it he said?

"A. 'The next time you might get killed.'

"Q. Mr. Scott, do you have any other items to assist you in arresting a party who's broken the law?

"A. Yes, sir. I have my revolver and also a chemical mace.

"Q. Did you attempt to use your other means of assistance?

"A. Yes, sir. Once I got out the apartment, I pulled my mace but was subdued again instantly and was unable to use it. There are two dents in it from where I had so much pressure holding it. They tried to, Malcolm Masters was trying to get this off of me.

"Q. Did you attempt to use your revolver at any time?

"A. No, sir, I did not.

"Q. Then what did you do, Mr. Scott?

"A. I went out through the front, through the first door into the vestibule and out on to the next door, which is a storm door, onto the landing at the top of the stairway. At this time in the morning, there was no traffic and I waited there for approximately one minute. A car came south on North 11th Street and I hollered at him several times. He finally got out of his car to see who was hollering and looked up and saw me, and I gave him a direct order to go to the police station and send me up some help immediately, which he did.

"Q. Do you know if anyone else had called the police station in the meantime?

"A. No, sir, I don't. No.

"Q. Had Mr. Shively left the apartment building?

"A. Yes, sir. I had given him an order to call, so—

"Q. Mr. Scott, at any time during the scuffle in the apartment or in the scuffle in the hallway outside of the apartment, did anyone come to your assistance, either Mr. McElroy, Mr. McCurdy, or Mr. Masters, to assist you in the problem you were having, other than Mr. Shively?

"A. No, sir."

It is the exclusive province of the jury to choose whether to believe that portion of the evidence and to disregard, after careful consideration and under proper instructions, any other evidence which might diminish its force. This court has no warrant to sort through the balance of the testimony as a defense lawyer might in preparation for the summation to the jury nor in any other way to supplant its judgment respecting the credibility of this witness for that of the jury. This is not our task and we have

not addressed ourselves to it. It would be contrary to law for us to do so. Our stewardship is discharged upon our having discovered ample support for the verdict in the testimony above quoted. Having done so, our duty is to overrule the first assignment of error. *Sandoffsky* v. *State* (1928), 29 Ohio App. 419. To do otherwise would require us to declare the testimony of this policeman-victim to be not worthy of belief.

The second and third assignments of error are not well taken for the following reasons: The evidence of prior criminal convictions was not produced by the prosecution as part of its case in chief or rebuttal. It was not until after the two defendants themselves, after the state had rested its case, voluntarily elected to waive their privileges and took the stand in their own defense. They were then cross-examined about the transactions complained of.

It has been well settled for a long time that, when the accused in a criminal trial elects to take the witness stand and gives evidence by this testimony in his own defense, he makes himself subject to cross-examination, and his credibility is in issue the same as any other witness. The limitations on such cross-examination rest within the sound discretion of the trial court, viewed in relation to the peculiar facts in each case, and such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion. The authorities are collected in 15 Ohio Jurisprudence 2d 536 *et seq.*; 3 Ohio Jurisprudence 2d 749. See, also, *State* v. *Hill* (1959), 111 Ohio App. 257; *Harper* v. *State* (1922), 106 Ohio St. 481.

Upon the whole record, we find no abuse of such discretion. In fact, even though no request was made by defense counsel for a limiting instruction, the trial court repeatedly cautioned the jury as to the limited purpose for which the evidence was admitted and, further, that they were not to consider the prior offenses as evidence of guilt or innocence of the defendants of the offenses charged in the indictment. In addition, the general subject of limited purpose testimony as applied to this case was excellently covered by the trial court in the general charge.

Those cases which have been cited to us dealing with the obligations of the trial court when such evidence comes in as part of the state's case are not in point.

The fourth and fifth assignments of error relate to the general charge. Upon a thorough review of all the evidence, we find no error prejudicial to the substantial rights of the defendants in these or in any other respects.

Upon careful consideration of the entire record, we find that both defendants had a fair trial, that there was no denial of their constitutional rights and that there was no error prejudicial to the substantial rights of either of them.

All five assignments of error are overruled. The judgment against each of the defendants is affirmed.

*Judgments affirmed.*

VAN NOSTRAN, P. J., concurs.

RUTHERFORD, J., concurs in the judgment affirming the conviction and sentence of Albert McElroy, but dissents from the judgment affirming the conviction and sentence of Bobby McCurdy.

RUTHERFORD, J., dissenting from the affirmance of the judgment of conviction and sentence of Bobby McCurdy. Albert McElroy, Malcolm Masters and Bobby McCurdy were each separately indicted on a charge that they did assault Martin Scott, by means of force likely to produce great bodily harm contrary to, and in violation of, Section 2901.241, Revised Code.

Section 2901.241, Revised Code, provides:

"No person shall assault another with a dangerous weapon or instrument or by other means or force likely to produce death or great bodily harm.

"Whoever violates this section shall be imprisoned in the penitentiary not less than one nor more than five years."

After entering pleas of "not guilty," Albert McElroy and Bobby McCurdy were jointly tried. The jury returned

separate verdicts finding Albert McElroy and Bobby Mc-Curdy each "Guilty of 'Aggravated Assault, R. C. Section 2901.241' in the manner and form as he stands charged in the indictment."

Albert McElroy and Bobby McCurdy were, thereafter, sentenced to the Ohio State Penitentiary, Columbus, Ohio, for terms of one to five years, pursuant to Section 2901.241, Revised Code, and each has timely perfected an appeal.

On the morning in question there was a disturbance from the loud playing of a record player in an apartment occupied by Mr. and Mrs. Albert McElroy. Mr. Clyde Fouts and George E. Shively were tenants in other apartments in the building. Mr. Fouts and Mr. Shively both made complaints, and Mr. Shively, after complaining to Patrolman Martin Scott at the bottom of the stairway, walked up the stairway with the patrolman but then went to his own apartment, while Patrolman Scott went to the McElroy apartment. Patrolman Scott after knocking was invited into the apartment by Albert McElroy. Malcolm Masters and Bobby McCurdy were also present in the apartment. Following some conversation between the McElroys and Patrolman Scott concerning the disturbance, a fracas ensued between Albert McElroy and Patrolman Scott, which lasted for only about a minute. Concerning the fracas the pertinent testimony of Patrolman Scott is set forth in the majority opinion. Albert McElroy and Bobby McCurdy also testified, and George E. Shively was called as a witness for the state.

Pertinent portions of Albert McElroy's testimony are as follows:

"Q. You hit him?

"A. Yes, when he was gonna swing that slapstick at me.

"Q. What did you hit him with?

"A. My fist.

"Q. Where did you hit him?

"A. I don't know. I just hit him.

"Q. What happened then?

"A. Well, we rolled against the bed. And finally I

got him out of the bed and got him out to the hall, and that's when Malcolm Masters and Bob McCurdy, they pulled me off from him."

"Q. Now, seeing as how you were the, seemingly the basic participant in this thing, did Mr. McCurdy, in any way—Well, what could you tell us about Mr. McCurdy's actions towards Mr. Scott?

"A. There wasn't no actions. Mr. McCurdy, the only thing, talked to me and told me to get off from him."

"Q. What happened when you hit him?

"A. I knocked him through my living room onto my bed and we was wrestling and, after that, I don't know where his slapstick was. I got him out into the hall and Bob and Malcolm Masters peeled me off of him."

"A. I hit him and then he grabbed hold of my shirt and tore my shirt and, when we went, we fell across the bed and wrestled, and then we got up and off the bed and onto the floor and out into the hall, and that is when Bob and Malcolm had a-hold of me pullin' me off of him.

"Q. Now you hit him and knocked him through the one door into the bedroom, right, or did he grab your shirt when you hit him?

"A. He grabbed my shirt when I hit him and his weight and my weight, we went on the bed.

"Q. In the bedroom?

"A. Yes, sir.

"Q. But this swingin' took place in the front room, did it not?

"A. In the middle of the front room, yes.

"Q. Well, if he had a chance to grab your shirt, Mr. McElroy, don't you think he'd have had a chance to use this slapstick?

"A. I don't know. He pulled it. I hit him. I didn't hit him that hard.

"Q. Well, you bloodied his nose and so forth. You must have took a pretty good swing at him, didn't you?

"A. I don't know. Maybe his nose bleeds easy."

"A. * * * Me and him, we wrestled out into the hall off of the bedroom.

"Q. In other words, there wasn't anyone here involved except you?

"A. As far as any fightin', no.

"Q. You don't remember these other two guys being in on the fight itself?

"A. No."

Pertinent portions of Bobby McCurdy's testimony are as follows:

"Q. Now, did you see the incident which happened in the apartment?

"A. I was still sitting at the kitchen table when the incident started.

"Q. Now when did you become involved in the incident?

"A. When Mr. McElroy's wife said, 'Get Abe off of him.' "

"Q. Now, what did you do at that time?

"A. I grabbed Abe and Malcolm both. They were both on him and I was trying to get one or the other one off of him.

"Q. Now, did you see any evidence of either Mr. Masters or Mr. McElroy taking a swing?

"A. No, I did not, sir."

"Q. Now, did you manage to pry any of the parties apart?

"A. Yes, sir. I managed to get Malcolm clear away from him, and I tried to get Abe, and I talked to Abe enough to get him cooled down and he was standing there.

"Q. But you didn't actually see the fray in the apartment itself?

"A. No, sir.

"Q. Did you in any way participate in it?

"A. No, sir."

"Q. Well, when Mrs. McElroy said to you, 'Get Abe off of this fellow,' what did you discover when you went into the other room?

"A. I got to the hall and Abe and Malcolm was out there and had a hold on him out in the hall. They had him pushed up against the wall.

116

"Q. What hall are you talking about, the hall outside the apartment or the hallway inside the apartment?

"A. There's no hallway inside the apartment.

"Q. In other words, by the time you got there, these parties were clear out in the hallway which is a part of the apartments?

"A. Yes, sir."

"Q. And when you saw Mr. Shively, at that point, were you backing up towards the other end of the hall or did you start to back up when you saw Mr. Shively?

"A. I had ahold of Malcolm pulling Malcolm back when Mr. Shively come out."

Mr. George E. Shively, the only disinterested witness, who had lived in another apartment in the building and had complained to Patrolman Scott, was called as a witness for the state and on direct examination testified as follows:

"Q. When you got down to the bottom of the steps, Mr. Shively, did you have a conversation with Mr. Scott?

"A. I did.

"Q. Did you request anything of him?

"A. I told him there was a lot of noise upstairs.

"Q. And did he go up to investigate the noise?

"A. He said, 'I can hear the radio down here,' and he went upstairs.

"Q. Then did you again see Mr. Scott, Mr. Shively?

"A. I did.

"Q. When did you next see him?

"A. Well, when he went upstairs, I went back into my apartment, and I couldn't accurately set the time or the time elapses, but I heard a commotion out in the hallway, so I came back out of my apartment.

"Q. And what did you see when you came back out of the apartment?

"A. Well, there was Patrolman Scott and the defendants beside the staircase going up to the third floor apartment of Mr. Fouts, and Patrolman Scott was against the wall being restrained.

"A. I saw three men: Mr. McCurdy, Mr. McElroy, and evidently Mr. Masters.

"Q. And how many men had Mr. Scott restrained against the wall?

"A. I would say two. There was three men there.

"Q. Do you know which two it was, or which one it was, besides Mrs. McElroy?

"A. Well, Mr. McCurdy was, in my estimation, trying to restrain Mr. Masters. In other words, he had his hand like he was tryin' to pull him back."

"Q. Well, Mr. Shively, you say Mr. McCurdy backed off. Was he over where Mr. Scott was then at the time you first came out of your apartment?

"A. He was in the vicinity.

"Q. All three of them?

"A. As I said, he was, to my knowledge or to my presumption, he was trying to restrain Mr. McElroy.

"Q. Did you go to the Carrousel Club then, Mr. Shively?

"A. I did.

"Q. What did you do when you got down to the Carrousel Club?

"A. I opened the phone booth and called the station. I had a direct order from Patrolman Scott to call the station."

On cross-examination, Bobby McCurdy admitted entering pleas of guilty to charges of assault filed against him six to eight years previous to the present charge of aggravated assault.

As against the evidence of the complaining witness that Bobby McCurdy was trying to get at him between the other two, the record presents the evidence of the defendant Albert McElroy admitting that he was the assailant but stating that Bobby McCurdy was trying to stop him; the testimony of Bobby that he grabbed Abe and Malcolm and was trying to get one or the other one off Scott; and, much more important, the testimony of George Shively, a disinterested eyewitness, who, on direct examination as a witness for the state, testified that Bobby McCurdy was trying to restrain Masters and McElroy.

Absent the testimony of the state's own disinterested eyewitness given on direct examination, I would concur in

the affirmance of both judgments of conviction and sentence, but in view of the testimony of the state's own eyewitness, given upon direct examination, which corroborates the testimony of both defendants, I cannot concur in the holding of the syllabus that all matters of sufficiency and/or weight of the evidence must necessarily be determined by the jury upon the issue of credibility alone in such manner as to preclude an appellate court from making any determination of the sufficiency of the evidence after consideration of the nature of the evidence as a whole.

Upon consideration of the evidence as a whole, in my opinion the evidence produced fails to attain the high degree of probative force and certainty which the law demands to support a conviction of Bobby McCurdy of aggravated assault as charged. If Bobby McCurdy is convicted upon the evidence contained in this record, we have an explanation of why any person with a past record and similar associations, neither of which affords substantive proof of guilt, would be justified in not giving assistance to a person attacked because he cannot afford to take the risk of becoming involved in any fracas which may result in his conviction for aggravated assault and imprisonment in the penitentiary for a period of one to five years, upon the statement of a complaining witness that he was trying to get at him between his two attackers, even though the testimony of the assailant and of a disinterested witness called by the state on direct examination exonerates him.

I would affirm the conviction and sentence of Albert McElroy, but I would reverse the conviction and sentence of Bobby McCurdy because of insufficiency of the evidence to support the conviction of aggravated assault as charged, by proof beyond a reasonable doubt, and would enter judgment that Bobby McCurdy be discharged.