THE STATE OF OHIO, APPELLEE, *v.* PATTERSON, APPELLANT.

(No. C-73518—Decided August 5, 1974.)

Mr. *Simon L. Leis, Jr.,* Mr. *William P. Whalen,* and Mr. *Merlyn Shiverdecker,* for appellee.

Mr. *Peter C. Wettstein* and Mr. *A. Lawrence Muzzo,* for appellant.

PALMER, J. Defendant, the appellant herein, was indicted on counts of assault with intent to rob, and with the unlawful killing of one Walter Hemmig while attempting to perpetrate a robbery. A trial by jury was had on the pleas of not guilty, resulting in verdicts of guilty on both counts, and sentence was thereafter passed as ap-

pears of record. A motion for new trial was timely filed, argued, and in due course overruled.

Defendant raises two assignments of error phrased as follows: (1) that the trial court erred in admitting evidence of the defendant's handling of a .22 caliber revolver subsequent to the date of the crime and of the armed robbery of the St. Bernard Kroger Store solely for the purpose of impeachment by contradiction, and (2) that the court erred in failing to grant defendant's motion to dismiss, at the close of the state's case and again at the conclusion of all the evidence, because the state failed to establish beyond a reasonable doubt the element of ''attempting to perpetrate robbery,'' as charged in the indictment. The second of these assignments, requiring a factual review, will be considered first.

The record reveals that on April 14, 1972, Walter Hemmig was operating his business, known as Hemmig's Food Market, at 301 Emming Street, Cincinnati. This store had only one entrance, the front, the back having been boarded up. At about 7 p. m., Carol Bowman, her five year old son, and Sharon Harris entered the store for the purpose of purchasing cigarettes. The two adults testified that Walter Hemmig was behind the counter by the cash register, and that the only other persons in the store were three black youths, one on the telephone with his back turned, another drinking a bottle of beer, and a third, who stared for some moments at Carol. This third youth was subsequently identified as the defendant, in a police lineup following his arrest and in court by both Carol and Sharon. Such identification followed the viewing and rejection by both of numerous police photographs of other suspects at various times during the year that elapsed between the incident and the arrest. The identification of defendant by both Carol and Sharon, as well as by a later witness, Becky Young, was positive and convincing.

Completing their purchase, Carol, the child, and Sharon left, noting as they did so that two twelve year old girls, Becky Young (Carol's sister) and Annette Gibson, were approaching the front door of the store. A few moments

later, as they were crossing the street, both heard a shot, turned and saw the three black youths running out of the store followed by Walter Hemmig holding his chest and hollering that he had been shot. They rushed to assist Hemmig, with other neighbors attracted by the noise, carrying him into the entry way of the store where he then or very shortly thereafter expired.

Becky Young, one of the twelve year old girls, testified that as she and Annette were about to enter the store, she saw the defendant standing behind Walter Hemmig in back of the counter with one hand over Hemmig's mouth and the other arm behind Hemmig's back. They were struggling, and Hemmig was "screaming for help." Frightened, she turned around and started to run away but before getting very far, heard a shot, and turned around to see defendant and "two other guys running out of the store." Becky's companion, Annette, called as a witness for defendant, testified similarly, stating:

"Well, I was going to the store, and I got right to the door, and there was three guys in the store and Walter. One was behind the counter, and the other two was like getting waited on. So they was like struggling, and the gun went off and then I ran. I turned back around to go back into the store, and the two of them ran past me and the other one bumped right into me, and he just kept on going down the street."

The one who bumped into her was the one she saw struggling behind the counter with Hemmig, and Annette saw that he still had a gun in his hand. Annette was not, however, able to identify this individual as the defendant.

A police officer, who arrived at the scene some twenty minutes after the shooting, observed the interior of the store, noting items of stock or boxes strewn about the floor and noting that the drawer of the cash register, behind which the struggle took place, stood open. Photographs of this were taken and introduced in evidence. No cash or other property was found missing.

The defendant's primary defense was alibi, supported by his mother, sister, girl friend, and by his own testimony.

This testimony directly conflicted with the identification of defendant by three witnesses for the state, and was obviously not credited by the jury. Defendant concedes the competence and authority of the jury to determine this disputed issue, and relies on the argued absence of credible evidence that defendant was engaged in "attempting to perpetrate a robbery." We cannot agree.

While it is clear that no *consummated* robbery took place, since no property was found to be missing, it is also clear to us that there was substantial credible evidence of probative value from which the jury could have found that the killing occurred, as charged in the indictment, while defendant was *attempting* to consummate the robbery. The fatal tussle behind the counter and cash register between the armed defendant and the struggling and protesting victim, the open cash register drawer and items strewn about the floor, and the flight from the scene of defendant and his companions immediately following the revolver shot, lead, irresistibly it seems to us, to the inference, proper for the triers of fact to draw, that defendant was attempting a robbery which was never completed in the panic that attended the victim's unexpected resistance and its fatal outcome. Defendant's second assignment of error is accordingly overruled.

Defendant's other assignment of error, calling into question the propriety of an evidentiary examination by the state into an offense unconnected with the instant incident, raises a more serious problem, it seems to us. At the outset of the case, the state indicated its intention to adduce evidence under R. C. 2945.59 of the defendant's involvement in an armed robbery at a Kroger store in St. Bernard, Ohio, on March 22, 1973. The trial court granted a voir dire examination, out of the presence of the jury, of the state's witnesses expected to testify to this later incident. Two witnesses, employees of Kroger, were called and testified on voir dire to defendant's involvement in an armed robbery at that store on the date in question, in which defendant was armed with a .22 caliber pistol and fired several shots into the floor of the store. Following the completion of the

state's case in chief, as outlined in the earlier pages of this decision, the state indicated its intention of calling the two Kroger Company employees to testify as to the 1973 robbery. Defendant entered his objection to this testimony, citing *State* v. *Hector,* 19 Ohio St. 2d 167, and the court sustained the objection without, however, indicating the grounds therefor. The state thereupon rested its case without further reference to the subsequent robbery.

The defendant, having offered himself to give testimony to support his alibi defense, and having denied any involvement in the killing of Walter Hemmig, was then cross-examined by the state, as follows:

"Q. Have you ever handled a .22 revolver?

"A. No, sir, I haven't."

After pursuing this for a few more questions and receiving negative answers, defendant testified:

"Q. Mr. Patterson, on the 22nd day of March, 1973 did you enter a Kroger store armed with a .22 revolver? * * *

"A. No, I did not."

Objections to this and the several questions directed to the same incident that followed were overruled, and the defendant continued to deny having handled or fired a .22 revolver either on April 14, 1972, or on March 22, 1973, or anytime in-between, and denied any involvement in the Kroger Company robbery. In connection with the above questions, the trial court gave the jury the first of a series of similar instructions, stating:

"I think at this point, I should instruct the jury that if any evidence should be developed tending to show the defendant's involvement in some other crime, that has absolutely nothing to do with his guilt in the crime that we're concerned with here. It's admitted solely for the purpose of his credibility, that is, his telling the truth."

This instruction in substance was repeated when defendant was dismissed as a witness.

After defendant had concluded his case, the state on rebuttal called the first of the two Kroger Company witnesses who had testified on voir dire. Defendant thereupon interposed his objection to permitting the witnesses to testi-

fy ''because none of her testimony will have anything to do with this case or have any bearing on it.'' The court felt itself technically unable to anticipate what the witness would say until it was offered, but cautioned the state, nevertheless:

''However, the record will show that I have heard her testimony on voir dire here on Monday, I think it was, or whatever it was, and I might suggest to you, Mr. Whalen, that you're getting on a damn thin ground here.

''Mr. Whalen: I'm well aware of that, Judge.

''The Court: You're liable to run into a mistrial, and I'd hate to see that.''

The testimony of the Kroger Company employee was accordingly received and, in substance, duplicated that given in the earlier voir dire examination. Supplementary testimony was offered by the St. Bernard policeman who investigated the Kroger robbery and discovered the shell casings expended by the robber, and by a second police expert who identified the casings found in the Kroger store after the robbery as .22 caliber rimfire, the same type used in the Hemmig homicide, although except for type, the bullets in the two robberies ''didn't compare.''

At the conclusion of this rebuttal evidence, the court again instructed the jury, as it did subsequently in its general charge, as follows:

''Members of the jury, this testimony that you've heard this morning about an incident which occurred allegedly involving the defendant on March 23—am I correct on that date—March 22, 1973 in St. Bernard is admitted for a single purpose and a single purpose only. I suggested yesterday that some of the examination was admitted for a single purpose, and this evidence that you've heard concerning the occurrence in St. Bernard on March 23, 1973 is also for that single purpose. It goes to the sole purpose of the credibility of the defendant, that is, is he telling the truth or is he not telling the truth, and it has absolutely nothing to do with his innocence or guilt of the offense charged other than as it touches on the question of credibility.''

Defendant's counsel, while preserving his objection to

the presentation of the evidence, conceded that he had no quarrel with the court's various instructions limiting receipt of the testimony to the issue of credibility.

Defendant argues that a witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial, citing *Byomin* v. *Alvis,* 169 Ohio St. 395, and *Clinton* v. *Ohio,* 33 Ohio St. 27. Since the trial court, argues the defendant, by rejecting the proffered testimony of the Kroger Company robbery under R. C. 2945.59, determined that the evidence was immaterial and collateral, the court erred in nevertheless permitting the witness to be impeached by evidence of the "collateral" matters. The defendant concedes that by voluntarily offering his testimony, his credibility became an appropriate issue for attack, but denies that the mode of attack here was proper.

We think the appropriate test in determining the propriety of the state's attack on defendant's credibility is set forth most recently and clearly in *State* v. *Porter,* 14 Ohio St. 2d 10, especially at pages 12 and 13, where the court summarized the issues and rule of the case as follows:

"False information was furnished by affidavit by the accused on his marriage license application. Information contained in a Michigan marriage license application is to be provided under oath, and a false statement sworn to on an application renders the affiant liable for prosecution for perjury. Sections 25.33 and 25.39, Michigan Statutes (1961 Rev.). The state sought to test the veracity of the accused by showing the falsification. The credibility of the accused was crucial to the issue of guilt for his testimony in many respects was contrary to that of the complaining witness. As the veracity or credibility of the accused was of great significance, the inquiry of the state was pertinent. Any disparagement which resulted from this line of cross-examination resulted not from the fact that he had been married three times previously, a fact which was irrelevant in the instant trial, but resulted from the fact of the falsification itself. The jury could reasonably conclude that as the accused had lied on the marriage license application, he may

have also lied in his testimony at the trial regarding the material element of nonsupport. The court, upon the defendant's objection, instructed the jury that it could consider the testimony only for its effect on the witness' veracity and not as substantive evidence in the case.

"No prejudicial error was committed by the trial court when the court permitted the state, during cross-examination of the accused, to attempt to impeach his credibility by showing a falsification of an application for a marriage license which he executed under oath."

See also 15 Ohio Jurisprudence 2d 289, Rev., Criminal Law, Section 290.

Here, as in the *Porter* case, the defendant by his defense of alibi and his denial of any involvement in the Hemmig homicide, made his veracity or credibility of crucial significance, for if the jury believed him, it would necessarily acquit him. This being the case, the inquiry of the state directed to his credibility was material, and the ground chosen—i. e., his familiarity with a .22 caliber weapon and involvement in a subsequent armed robbery—was pertinent. Compare *Byomin* v. *Alvis, supra,* where the matter sought to be impeached was trivial and of obvious immateriality to any issue in the case. As stated in *Harper* v. *State,* 106 Ohio St. 481, 485:

"Evidence relevant upon the question of credibility, especially of an interested witness, is in no sense collateral, but goes directly to the weighing of his testimony, which the jury and the court must do if the testimony relates to any matter material to the controversy."

The question that must be determined, in our view, is not whether the state had the *right* to test the crucial issue of the credibility of the defendant by examining into his familiarity with the use of a weapon similar to that used in the instant homicide, which was used in a similar incident, but rather whether the trial court erred in permitting the state to *exceed or abuse* its undoubted right so to do. The obvious danger in this situation is that evidence of a former (or subsequent) crime is apt to be considered by the jury as proof of guilt of the crime for which the defendant

is being tried, or otherwise to prejudice them against the defendant. *Maranda* v. *State,* 17 Ohio App. 479, 489. As the trial judge here appropriately remarked, the line is a thin one, and flagrant abuse of the state's right to challenge a defendant's credibility would not necessarily be cured by the kind of instructions to the jury given here, limiting the receipt of the testimony to the issue of credibility only.

"It has been well settled for a long time that, when the accused in a criminal trial elects to take the witness stand and gives evidence by this testimony in his own defense, he makes himself subject to cross-examination, and his credibility is in issue the same as any other witness. *The limitations on such cross-examination rest within the sound discretion of the trial court, viewed in relation to the peculiar facts in each case, and such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion.*" *State* v. *McElroy,* 22 Ohio App. 2d 103, 111. (Emphasis added.)

See also *Maranda* v. *State, supra* 491, 492; *Smith* v. *State,* 125 Ohio St. 137; 15 Ohio Jurisprudence 2d 788, Criminal Law, Section 366. Using this as our test, we have carefully examined the instant record, and have concluded that the record does not manifest a clear showing of an abuse of discretion by the trial court.

It is clear that the trial judge was alert to the delicacy of the inquiry, that he promptly and punctiliously instructed the jury at each logical step of the testimony that the Kroger Company incident was not to be considered by the jury as bearing in any degree on the question of whether defendant was guilty or innocent of the instant charges, but was limited solely to the issue of his credibility, and that the rebuttal testimony offered by the state could be considered the reasonable minimum in both duration and drama necessary to rebut the assertions of the defendant on cross-examination. At the same time, we are constrained to note that in our judgment the facts in this case push the *Porter* rule close to its limits, inviting the suspicion, as they do, that the state may have been attempting by indirection that which it had been denied directly, under R. C. 2945.59.

While we are satisfied that upon the particular facts of this case, where the nature of the defense and defendants own testimony made his credibility the major issue, the Ohio rule permits the type of limited rebuttal response actually made by the state and that no error prejudicial to defendant intervened, yet we are not to be read as condoning flanking attacks on *State* v. *Hector, supra*. The state should understand that it always embarks upon this course at its peril, and the moment the impeachment process by evidence of prior or subsequent offenses passes the fine line separating the issue of credibility of the witness from the issue of the guilt of the defendant, prejudicial error intervenes.

For the reasons heretofore stated, defendants first assignment of error is overruled.

The judgment is accordingly affirmed.

*Judgment affirmed.*

HESS, P. J., and SHANNON, J., concur.