### State v. Franklin
*[Cite as 6 AOA 3]*

*Case No. C-890028*
*Hamilton County, (1st)*
*Decided August 15, 1990*

*Arthur M. Ney, Jr., Prosecuting Attorney, and William E. Breyer, Esq., 411 Hamilton County Courthouse, Court and Main Streets, Cincinnati, Ohio 45202, for Plaintiff-Appellee.*

*Roxann H. Dieffenbach, Esq., 702 American Building, 30 East Central Parkway, Cincinnati, Ohio 45202, and Candace C. Greenham, Esq., 36 East Fourth Street, Cincinnati, Ohio 45202, for Defendant-Appellant.*

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common Pleas, the transcript of the proceedings, the assignments of error, the briefs and arguments of counsel.

On August 26, 1988, a grand jury in Hamilton County returned an indictment in which the defendant-appellant, George T. Franklin, was charged with three offenses:

(1) Aggravated murder, for the purposeful killing of one Gerald R. Strauss, with the specification that Franklin committed the murder while committing an aggravated burglary on August 7, 1988; (2) aggravated burglary of the permanent habitation of Gerald R. Strauss on August 7, 1988; and (3) aggravated burglary of the permanent habitation of one Rasha Winston on July 28, 1988.

After entering a plea of not guilty, Franklin moved to sever the counts, which motion was overruled.

On November 28, 1988, trial to a jury commenced, and three days later Franklin was found guilty as charged in all counts and in the specification.

The penalty phase of the proceedings commenced on December 12, 1988, and the judge imposed the death penalty for the aggravated murder, on the basis of the recommendation given by the jury after it concluded that the aggravating circumstance out-weighed the mitigating factors beyond a reasonable doubt. With respect to the aggravated burglaries, Franklin was sentenced to consecutive terms of imprisonment of ten to twenty-five years with ten years' actual incarceration.

In the review of a death-penalty case, R.C. 2929.05 requires us to complete three tasks. After addressing each assignment of error presented by the appellant, we must independently determine whether the specified aggravating circumstances of the homicide in question outweigh the factors presented in mitigation of punishment, and then determine whether the sentence of death is appropriate, after considering whether it is excessive or disproportionate to the penalty imposed in similar cases.

Having studied the death-penalty cases in this jurisdiction as the law requires, and having reviewed the record certified to us by the trial court, we find no prejudicial error in this appeal and overrule all six of the assignments of error before us. We are further persuaded that the

aggravated circumstance of the homicide of Gerald R. Strauss outweighs the mitigating factors present in this record, and that the sentence of death imposed below is appropriate.

## I.

On July 21, 1988, Rasha Winston left the apartment in which she lived at 2632 Eden Avenue, Cincinnati, Ohio, at about 1:00 p.m. When she returned some three hours later, she discovered that a screen upon a rear window had been cut and removed. Miss Winston found that her television set was missing and certain items, including a framed photograph, were disarranged. She summoned Cincinnati police, whose investigation revealed that the window through which they believed entry to the apartment had been gained was at a considerable height above ground level. The earth immediately beneath the window bore a circular imprint similar, to their eyes, to that which would have been made by a metal garbage can placed there to stand upon by one who intended to enter through the window above.

An investigating officer observed that the only metal garbage cans in the vicinity were located in the rear of a building immediately adjacent to the scene of the burglary. Ultimately, that location was determined to be the residence of Franklin's grandfather. One of those cans bore traces of mud on its rim even though, when first seen, it rested upon a concrete surface. R a s h a Winston had had a passing acquaintance with Franklin and had witnessed him watching her on repeated occasions through a window in his grandfather's house while Franklin was living there. Consequently, Winston voiced to the police her suspicion that he was the burglar.

When police located Franklin, he appeared to them to be nervous and he made numerous inquiries about the nature of the evidence police had gathered with respect to the burglary. At that time, Franklin gave his name as George Fichtel.

On the following day, police again contacted Winston, learned that a framed photograph had been moved from where it had been when she left the apartment on July 21, and recovered from the frame a fingerprint which was determined eventually to belong to Franklin. When he was fingerprinted to provide a standard of comparison, he identified himself as George Franklin.

On or about July 23, 1988, Gerald R. Strauss, the victim of the murder, and his fiancee, Karen Strain, moved into a unit in a condominium, which they intended to be their home, located in the immediate neighborhood of Rasha Winston's apartment. One of the items placed in the new home was a bottle which had contained the champagne which they had consumed together on what Strain described as a particularly romantic evening during their courtship. For want of a better place, Strain put the bottle on the sill of a window on the first floor of their home.

On the morning of August 7, 1988, Strain left the home to attend to business in another city. During that day, a Sunday, Strauss entertained friends, and after they had departed he was seen by a neighbor cleaning up his home at about 10:00 p.m.

Sometime between 11:00 and 11:30 p.m. the same night, a woman was walking with her dog along a path that carried her by Strauss's condominium. At trial, she testified that as she got to the building she heard "a horrible scream and it was a scream of no." (T.p. 910.) She said she was "transfixed" and stood there looking to see "if something was wrong." (T.p. 911.)

When Strauss failed to appear at his place of employment on Monday, August 8, a fellow employee attempted to reach him by telephone. When repeated calls produced only a busy signal, that caller contacted a telephone operator who advised that no one was using the line. The fellow employee, Mitch Walker, then went to Strauss's home. Walker testified that, when he arrived at about 10:00 a.m., the front door was slightly ajar, propped open by a piece of carpeting. When no one answered his calls, Walker decided to seek assistance and found a police officer in a shopping area nearby. Only the officer entered the apartment. He found the battered body of Gerald Strauss in a second-floor bedroom.

The officer secured the scene after calling for assistance from other police. He then began an investigation of the premises and saw a window on the side of the house from which the screen had been cut and partially removed.

The postmortem examination of Strauss's body revealed "defensive wounds" on the right hand and also showed that Strauss's face and skull had been beaten and crushed to the extent that the left eye was destroyed and fragments of the skull driven into the brain. Because of the extensive injuries, the coroner was unable to determine how many blows had been struck, but he was certain that death had resulted from the multiple injuries. Ultimately, a police officer and his search dog recovered, among other items identified as having come from Strauss's home, a

hammer within underbrush in a wooded area not far from the murder scene. That hammer, wiped clean of any fingerprints but bloodstained, was determined to be the murder weapon.

When experts within the police division examined the champagne bottle, which was found not upon the windowsill where it had been when last seen by Strain but on the second floor near Strauss's bedroom, fingerprints were discovered and lifted. One of those prints was identified positively as that of Franklin.

On August 18, 1988, police traced Franklin, who had disappeared after his fingerprint involved him definitely in the burglary of Winston's apartment, to an address on Hackberry street in Cincinnati. An apartment at that address was occupied by one Glenn Davis. When police confronted Davis, he told them the only other occupant was his cousin, "Gerald Evans." When "Evans" emerged from an inner room, police recognized him as Franklin despite his claim that his name was Gerald Evans. Franklin was arrested on the spot and charged with the aggravated burglary of Winston's apartment, and the three-count indictment eventuated.

Franklin did not testify in his own defense, but he did, in the penalty stage of the proceedings, make an unsworn statement.

After the entry of judgment upon the verdicts and the imposition of the sentences, Franklin's counsel upon trial were permitted to withdraw and the court appointed new counsel to advance his appeal.

They have given us six assignments of error which we will consider *ad seriatim.*

## II.

In the first assignment of error, Franklin asserts that, for a variety of reasons, the Ohio capital-punishment statutes are unconstitutional and that, resultantly, the trial court erred in overruling his challenges to them on constitutional grounds and in sentencing him to death.

The first particular of Franklin's argument is that the application of the death penalty offends the Fourteenth Amendment to the United States Constitution and Article 1, Section 16, of the Ohio Constitution. This constitutes a general attack upon Ohio's statutory scheme for the imposition of capital punishment.

In *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 473 N.E.2d 264, paragraph one of the syllabus, the Ohio Supreme Court held:

"Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the Constitution or any provision of the Ohio Constitution."

The Court has remained steadfast since and has consistently rejected arguments akin to those made by Franklin which question the quoted determination. See, e.g., *State v. Henderson* (1988), 39 Ohio St. 3d 24, 528 N.E.2d 1237; *State v. Coleman* (1988), 37 Ohio St. 3d 286, 525 N.E.2d 792; *State v. Maurer* (1984), 15 Ohio St. 3d 239, 473 N.E. 2d 768.

Franklin submits next, essentially, that a statute which permits the prosecution to employ the same underlying felony to elevate a homicide (which Franklin characterizes as "ordinary") to an aggravated murder and then to a "death-eligible" aggravated murder cannot stand constitutional muster.

The Ohio Supreme Court has given us the authority upon which to hold Franklin's point not to be well taken in *State v. Henderson, supra,* paragraph one of the syllabus:

"Ohio's capital sentencing scheme does not violate the Ohio or United States Constitutions even if the aggravating circumstances for felony murder (set forth in R.C. 2929.04[A][7]) are identical to the elements of aggravated murder (set forth in R.C. 2903.01[B]). (*State v. Jenkins* [1984], 15 Ohio St. 3d 164, 177-178, 15 OBR 311, 322-323, 473 N.E. 2d 264, 279-280, followed.)

Franklin's third argument upon his first assignment is:

"The requirement that a jury or three judge panel must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional; * * *"

The Ohio Supreme Court has already refused to adopt these precepts as they have been advanced in one form or another. See *State v. Zuern* (1987), 32 Ohio St. 3d 56, 512 N.E. 2d 585; *State v. Rogers* (1986), 28 Ohio St. 3d 427, 504 N.E.2d 52; *State v. Buell* (1986), 22 Ohio St. 3d

124, 489 N.E. 2d 795; *State v. Maurer, supra; State v. Jenkins, supra.*

Franklin's fourth and fifth subsidiary submissions are that Ohio's death-penalty statutes fail to provide adequate standards by which a jury is to be guided in weighing the aggravating factors against those which may be mitigating factors so as to obviate an arbitrary or capricious infliction of the penalty of death.

Our rejection of these arguments is compelled by the holdings in *State v. Scott* (1986), 26 Ohio St. 3d 92, 497 N.E. 2d 55, and *State v. Williams* (1986), 23 Ohio St. 3d 16, 490 N.E.2d 906.

Resultantly, the first assignment in all its particulars is overruled.

Franklin's second assignment questions the decision not to sever the third count from the first two in the indictment. His argument rests principally upon the contention that, by permitting the prosecution to proceed upon all counts, the trial court permitted the use of Evid. R. 404(B) to introduce evidence of other crimes and acts, the prejudicial effect of which, he asserts, substantially outweighed any probative value.

Clearly, Crim. R. 8 entitles the State to charge two or more offenses in the same indictment if the offenses charged are, *inter alia*, based upon two or more acts connected together or constitute parts of a common scheme or plan or are part of a course of criminal conduct.

Crim. R. 14 provides an accused an avenue of relief from prejudicial joinder.

The Supreme Court, however, gave this interpretation of the rule in *State v. Torres* (1981), 66 Ohio St. 2d 340, 421 N.E.2d 1288, in the syllabus:

"A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim. R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial."

Abuse of discretion connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court. *Pembaur v. Leis* (1982), 1 Ohio St. 3d 89, 437 N.E. 2d 1199.

Franklin argues that the burglary of Winston's home is totally unrelated to the Strauss burglary and homicide. We cannot agree.

The three offenses occurred in the seventeen-day span between July 21 and August 7, the premises broken and entered were located closely and the method by which entry was gained was markedly similar in both instances.

When announcing its decision to overrule Franklin's motion to sever the counts, the trial court wrote:

"*** any prejudicial effect this joinder may have on the defendant is negated by Evidence Rule 404(B), which would enable the state to introduce evidence of the prior Aggravated Robbery [sic], as set forth in Count Three, to prove the identity of the defendant in Counts One and Two." T.p. 76.

The court cited as authority for such conclusion the decision of this Court in *State v. Jamison* (Feb. 17, 1988), Hamilton App. No. C-850753, unreported, in which we rejected a claim of error, in a capital case, given in the same vein as Franklin's second assignment.

The Supreme Court affirmed our decision in *State v. Jamison* (1990), 49 Ohio St. 3d 182, 552 N.E.2d 180. The syllabus to the case is:

"Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid. R. 404(B). To be admissible these other acts must tend to show by substantial proof "identity" or other enumerated purposes under Evid. R. 404(B). Although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged. (*State v. Broom* [1988], 40 Ohio St. 3d 277, 533 N.E.2d 682; *State v. Flonnory* [1972], 31 Ohio St. 2d 124, 60 O.O. 2d 93, 285 N.E. 2d 726; *Whiteman v. State* [1928], 119 Ohio St. 285, 164 N.E. 51, followed; *State v. Hector* [1969], 19 Ohio St. 2d 167, 48 O.O. 2d 199, 249 N.E. 2d 912, distinguished.)"

In making its decision whether to sever count three from the preceding two, the court was obliged to apply a balancing test. In this regard, the broad discretion accorded it in determining the issue entitled the court to weigh all relevant factors. Cf. *State v. Wright* (1990), 48 Ohio St. 3d 5, 548 N.E.2d 923 (considering Evid. R. 609 in conjunction with Evid. R. 403).

Given the breadth of the ambit within which a court can exercise its discretion while balancing the probative value of evidence against the danger of unfair prejudice, we can find nothing upon which to predicate a holding that the trial court here abused its discretion, as the Supreme Court has defined that term, in denying severance of the charges. It is clear to us that the court

considered all relevant factors before deciding the question, and we agree that the probative value of the evidence, *viz.*, its tendency to prove identity, outweighed any discernible prejudice to Franklin. The identity of the fingerprints provided the "clear linkage" referred to by the Supreme Court in *Jamison, supra.*

For the reasons given, the second assignment of error is overruled.

The third assignment of error is that the several convictions were against the manifest weight of the evidence.

In *Jamison, supra* at 191, 552 N.E. 2d 189, the Supreme Court restated what has, in the evolution of the criminal law of Ohio, become rubric:

"*** The weight to be given evidence and the credibility of witnesses are jury issues. *State v. DeHass* (1967), 10 Ohio St. 2d 230, 39 O.O. 2d 366, 227 N.E. 2d 212, paragraph one of the syllabus. "It is the minds of the jurors and not the minds of the judges of an appellate court that are to be convinced." *State v. Petro* (1947), 148 Ohio St. 473, 501, 36 O.O. 152, 163, 76 N.E. 2d 355, 369. The test on sufficiency is set forth in *State v. Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus:

'A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.'"

Under that test, there was evidence sufficient both in law and in probative value to support every essential element of all the crimes charged in the indictment.

In reviewing a claim that the judgment in a criminal case was against the manifest weight of the evidence, we must consider the entire record to determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S. Ct. 2211; *State v. Martin* (1983), 20 Ohio App. 3d 172, 485 N.E. 2d 717.

Our review of all that we are obliged to consider within this record convinces us that the evidence was such that the jury did not lose its way in finding Franklin guilty beyond a reasonable doubt of all charges. It should be noted here that, despite Franklin's contention, the prosecution was not relying upon circumstantial evidence alone to convict him.

Among the battery of facts confronting the jury was evidence that Franklin stated to one Larry Weaver, when he and Franklin were inmates in jail, that he had "got" one person and that eliminating a man who had testified against him at a trial "wouldn't hurt no more." (T.p. 1076.) The State also produced a witness, one Michael Turnbolt, who testified that shortly before Strauss was murdered Franklin was penniless but that when next seen by Turnbolt several hours after the time Strauss was murdered Franklin had some $100 to $150 in twenty- and ten-dollar A bills in his possession and had changed his shirt. Shortly before he was murdered, Strauss was known to have considerable cash upon his person, including twenty- and ten-dollar bills.

The jury was entitled to couple such evidence with that which revealed Franklin's elusive behavior and his use of a fictitious name in determining guilt.

For the reasons given the third assignment has no merit.

The fourth assignment is that the court erred in permitting the prosecution to introduce certain photographs and a video tape of Strauss's body and his home during the guilt phase of the trial.

It is Franklin's contention that the depiction of the cadaver and the crime scene were so gruesome as to influence the jury unfairly.

The general rule is that properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues, or if illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number. *State v. Maurer, supra.* The rule has been followed routinely. See, e.g., *State v. Coleman* (1989), 45 Ohio St. 3d 298, 544 N.E.2d 622; *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373; *State v. Apanovich* (1987), 33 Ohio St. 3d 19, 514 N.E.2d 394.

From the record, it is clear to us that the court exercised its discretion appropriately. The evidence contested in this assignment was illustrative, and relevant to prove the manner in which, and the intent with which, the murder was committed. None of the exhibits were such as to inflame a reasonable, objective jury. They were not cumulative in number. Their probative

value outweighed any apparent danger of prejudice to Franklin.

There being no demonstration of abuse of the court's discretion, the photographs, slides and videotape were admitted in accordance with law, and the assignment challenging their admission is overruled.

The fifth assignment is that the court erred in failing to grant Franklin's motion for a mistrial.

During the penalty phase of this cause, Franklin called one Arnold as a witness. Arnold, an attorney-at-law practicing in Cincinnati, and a volunteer probation officer of the Hamilton County Court of Common Pleas, had befriended Franklin. The friendship began in 1983, involving Arnold in the role of a "big brother" who assisted Franklin in obtaining employment and persuaded him to continue his education.

Despite a court-ordered separation of witnesses, Arnold had remained in the courtroom during the trial.

During his testimony, Arnold stated in response to an inquiry whether Franklin was a person who could be rehabilitated that:

"Yes, I think George is the type of person that would benefit from the rehabilitation that's offered him by A the correction system. I, frankly, don't think George is the type of person, at least I've never seen any evidence in my dealings with George that would lead me to believe that George could kill anyone." (T.p. 1352.)

The court sustained the prosecutor's immediate objection in these words:

"Objection is sustained. We're not here for that reason. The jury's [sic] already determined innocence or guilt." (T.p. 1352-53.)

In a subsequent colloquy with one of counsel for Franklin, the court, in the presence of the jury, added:

"The objection's sustained. He was here throughout the trial and could have testified about that during the trial." (T.p. 1353.)

The exchange prompted a defense motion for a mistrial, which was overruled forthwith.

However, before any argument prior to submission of the issues in the penalty phase to the jury, the court gave this admonition:

"Ladies and gentlemen of the jury, earlier this morning when the witness, Mr. Arnold, was on the stand the court made a remark about the witness, Arnold, something to the effect well, he could have testified to that at the trial. I'm talking about the first part of the case. And at the time the testimony of Arnold was revolving around the question of innocence or guilt of the defendant. What I meant when I said that, that that was the appropriate time for him to give that kind of testimony because it pertained to innocence or guilt. But I want you to remember that the defendant in this case isn't required to produce anything and if I gave you that impression, I want to dispel [sic] it and I'm going to ask you to disregard what I said about that. But I did think I should tell you what I meant when I said it." (T.p. 1367-68.)

Without question, a motion for a mistrial should be granted only when no other remedy is available to remove a possible taint upon the process.

Again, we must determine whether in refusing to arrest the case the court abused its discretion.

Guided by such cases as *Illinois v. Somerville* (1973), 410 U.S. 458, 93 S. Ct. 1066, we have held that a trial judge properly exercises his discretion in declaring a mistrial when the jury would not be able to reach an impartial verdict or if their verdict of guilty would have to be reversed on appeal due to an obvious procedural error. See, e.g., *State v. Dickey* (Nov. 7, 1984), Hamilton App. No. C-840091, unreported. When neither of those situations prevails, we give the jury credit for sufficient common sense and sound judgment to follow the instruction to disregard the evidence, including testimony, and ultimately to reach an impartial verdict.

Even if it is assumed, *arguendo*, that the first utterance of the court was erroneous, any prejudicial effect was removed by the curative, and correct, instruction.

There was in our estimate no abuse of discretion manifest by the manner in which the court ruled upon the motion for a mistrial and by its conduct in the aftermath.

The fifth assignment, accordingly, is overruled. Franklin's sixth and final assignment of error is that the conviction and the sentence of death are invalid as being based upon instructions to the jury which are erroneous as a matter of law.

Again, Franklin contends that the State presented nothing more than circumstantial evidence to the jury. Resultantly, he treasons, this issue is controlled by the holding of the Supreme Court in *State v. Lancaster* (1958), 167 Ohio St. 391, 149 N.E. 2d 157. There, the Court observed:

"In our opinion, in a murder case, where the evidence is circumstantial, the identification of

the killer is not shown by direct evidence, and, therefore, his identification must be proved, motive or lack thereof becomes an important question, and in such a case the trial court has a duty to instruct the jury that it should take the evidence on that question into consideration, together with all the other evidence and circumstances, in determining the guilt or innocence of the accused." *Id.* at 398, 149 N.E. 2d at 162-63.

There are a number of impediments to our adoption of Franklin's thesis.

First, no objection to the charge was given upon trial before the jury retired to deliberate. Under the rule in *State v. Underwood* (1983), 3 Ohio St. 3d 12, 444 N.E.2d 1332, this constitutes a waiver of any claim of error unless the outcome of the trial clearly would have been otherwise.

Secondly, no proposed instruction in writing was submitted below. This offends *State v. Fanning* (1982), 1 Ohio St. 3d 19, 437 N.E. 2d 583, and effectively eliminates the issue as one to be reviewed.

The dispositive fact, the first two questions aside, is that *Lancaster, supra,* is not apposite to this case. Simply put, there was substantially more than circumstantial evidence to be considered by the jury. Accordingly, the court had no duty to instruct as now requested. In the absence of any such plain error in the omission of any charge on the issue raised for the first time here, the rule of *Underwood, supra,* cannot be invoked to sustain a claim of reversible error on appeal.

Therefore, we overrule the sixth assignment.

### III.

Following the mandate of R.C. 2929.05(A), we turn now to the second aspect of our appellate review and proceed with the task of weighing the aggravating circumstance of this homicide against any mitigating factors demonstrated within the record.

The aggravating circumstance relevant to our inquiry is that found to exist, as specified in the indictment, during the guilt phase of the proceedings below; there is no need to address that circumstance here, because we have provided an ample factual context for it in an earlier part of this decision.

The mitigating factors are to be drawn from those found in R.C. 2929.04(B), summarized as follows:

1. the nature and circumstances of the offense;
2. the history, character and background of the offender;
3. whether the victim induced or facilitated the offense;
4. whether the offender was under duress, coercion or strong provocation at the time of the offense;
5. whether, at the time of the offense, the offender had a mental disease or defect that deprived him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law;
6. the youth of the offender;
7. the offender's history of criminal convictions and delinquency adjudications;
8. for one not a principal offender, the degree of participation in the offense and in the acts leading to the victim's death;
9. any other factors relevant to the imposition of the death penalty.

In weighing the aggravating circumstance, viz., that the murder of Strauss was committed while Franklin was also committing an aggravated burglary, the jury and the court considered all the evidence and arguments, the unsworn statement of Franklin, and all the remainder of information relevant to the particulars of the aggravating circumstance. In conjunction, the same entities considered the mitigating factors developed in the presentation of Franklin's case during the penalty phase.

In the opinion prepared by the court pursuant to R.C. 2929.03(F) and filed January 5, 1989, the court noted, *inter alia*, that at Franklin's specific request the jury and the court limited the mitigating factors to be considered by selecting from those enumerated in R.C. 2929.04(B) the following:

1. Franklin's youth;
2. The lack of significant history of prior criminal convictions and adjudications of delinquency on Franklin's part; and
3. Any other factors relevant to the issue whether Franklin should be sentenced to death.

Franklin offered the testimony of his brother, Kevin Kelly, aged fourteen, his grandfather, William Franklin, aged eighty-four, and his mother, Julia Franklin, as well as that of Stuart Arnold, whose appearance has been noted above. In sum, the witnesses portrayed Franklin as a good brother, a grandson who caused little or no trouble, a fun-loving, religious child who dropped out of school at the age of eighteen and found sporadic employment thereafter, and a quiet, even-tempered friend.

Franklin, himself, expressed sorrow for Strauss's family, denied the murder, stated his

lack of fear because of his faith in God and, for unspecified reasons, claimed that he had not been tried fairly.

Despite Franklin's deliberate limitation of the factors to be considered, we would take into account each of the statutory factors were it not for the admonition of the Supreme Court in *State v. DePew* (1988), 38 Ohio St. 3d 275, 290, 528 N.E.2d 542, 558.

In *DePew*, the appellant asserted that reversible error was committed in the penalty phase when the trial court instructed the jury on mitigating factors not claimed by the appellant. The Supreme Court held that the recitation by the Court to the jury of all the statutory mitigating factors was "certainly not prejudicial error." In context, however, the Supreme Court admonished its subordinates that:

"*** the better practice is certainly to refrain from even referring to mitigating factors not raised by the defendant." *Id.*Resultantly, our review is confined to those selected by Franklin and considered below. Factor number 2, *viz.*, the history, character and background of the defendant, seems to us, however, one to be considered in light of Franklin's presentations in the penalty phase as a sub-topic of factor number 7, Franklin's history of criminal convictions and delinquency adjudications.

The history, character and background of Franklin simply do not shift significantly the balance, standing alone or in tandem with any other factor, in a manner which weighs against the imposition of the death penalty.

Franklin's youth, factor six, does not serve to mitigate his punishment. He was twenty-two at the time, and while he was of relatively young age, the weight of this factor, in our judgment, is negligible in comparison to the horrible circumstance of the murder of which he stands convicted.

Franklin's history of criminal and juvenile misconduct does not weigh in his favor.

Our conclusion when considering the ninth factor is that there are no other relevant factors included within or suggested by the record to be balanced against the imposition of the death penalty recommended by the jury.

Accordingly, after reviewing all the factors required by the law, as interpreted in *DePew, supra*, we hold, in sum, that the aggravating circumstance, as set forth in the death-penalty specification included in the verdict of the jury, outweighs, beyond a reasonable doubt, what little may be said to support the mitigation of Franklin's punishment.

## IV.

The final phase of our review requires that we determine whether the death penalty is appropriate in this case. In carrying out this task, we must consider "whether that sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). Our examination is limited to capital prosecutions in this jurisdiction that have resulted in the imposition of the death penalty. *State v. Steffen* (1987), 31 Ohio St. 3d 111, 509 N.E. 2d 383, paragraph one of the syllabus.

Upon review of the cases decided by this court in which the death penalty has been imposed, we conclude that the sentence in the case *sub judice* is appropriate, and that it is neither excessive nor disproportionate to the penalty imposed in similar cases.

The judgment of the court of common pleas, including the sentence of death imposed for the aggravated murder of Gerald Strauss, is hereby affirmed.

*Judgment affirmed.*

SHANNON, P.J., DOAN and HILDEBRANDT, J.J.