DECISION AND JUDGMENT ENTRY
Appellant Leon Aliff was found guilty in the Lawrence County Court of Common Pleas of aggravated murder in violation of both R.C. 2903.01(A) and (B) with various specifications and aggravated burglary in violation of R.C.2911.11(A)(1) with a firearm specification. He assigns the following errors:
 1. The trial court committed reversible error to the prejudice of the Defendant-Appellant and abused its discretion by failing to include in its instructions to the jury a charge of voluntary manslaughter.
 2. The trial court erred to the prejudice of the Defendant-Appellant and abused its discretion by accepting into evidence the audio taped phone conversations between the Defendant-Appellant and the victim because the prosecution failed to set forth a proper evidentiary foundation.
 3. The trial court erred to the prejudice of the Defendant-Appellant and abused its discretion by failing to include in its instructions to the jury a charge of involuntary manslaughter, a lesser included offense of murder.
 4. The trial court erred to the prejudice of the Defendant-Appellant and abused its discretion by allowing the prosecution to introduce evidence of other wrongs or acts committed by the Defendant-Appellant.
Finding none of the assignments of error to be meritorious, we affirm appellant's convictions.
 I.
Appellant and Linda Aliff married in 1971. Mrs. Aliff filed for divorce on numerous occasions, most recently in May 1997. Upon filing this divorce action, Mrs. Aliff obtained an ex parte restraining order against appellant. Mrs. Aliff was also awarded exclusive use of the marital home located on Big Branch Road in Chesapeake, Ohio. Although the final divorce hearing occurred in August 1998, the magistrate did not render a decision at that time.
In the early morning hours of September 29, 1998, appellant drove from Huntington, West Virginia to the marital home. He kicked open the front door of the home, causing an alarm to sound. Appellant then proceeded down the hallway to the locked bedroom door and kicked it open. Shots were exchanged between appellant and Mrs. Aliff. Mrs. Aliff was shot numerous times and appellant was shot in the left hand.
The security company was alerted that Mrs. Aliff's alarm system had been breached at 2:38 a.m. and contacted the Lawrence County Sheriff's Office. Sgt. Randy Goodall was dispatched to the residence. The dispatcher informed Sgt. Goodall that Leon Aliff was the husband of the person living at that address and that he drove a late model green Cadillac. A Chesapeake police officer overheard this broadcast and informed the dispatcher that he had seen a late model green Cadillac cross the Huntington bridge and pass through Chesapeake heading toward Big Branch Road a short while before.
As Sgt. Goodall proceeded toward the Aliff residence, he observed a late model green Cadillac approaching him. Sgt. Goodall turned and pursued the Cadillac. After losing sight of the vehicle, he discovered the wrecked Cadillac near Symmes Creek, but did not find the driver. Sgt. Goodall observed two weapons with blood on them under the driver's seat, a Smith Wesson .38 revolver and a semiautomatic .9mm handgun. The .9mm weapon had no shells in it and the revolver contained five spent casings and one live round in the chamber.
Two Chesapeake police officers arrived at the Aliff residence and discovered Mrs. Aliff's body. Sgt. Goodall was notified of the discovery and a manhunt for appellant commenced. Appellant was found several hours later carrying $13,000 in cash.
The investigation revealed the presence of appellant's blood on the bedroom floor, down the hallway and out the front door, as well as on the road at a turn-around point three-tenths of a mile from the residence. A footprint from the front door was consistent with the shoe appellant was wearing when arrested and shell casings in the bedroom matched the guns found in appellant's car. A tape recorder with a tape on side B was also found in the bedroom. Dr. Keith Norton, the forensic pathologist who examined Mrs. Aliff's body, testified that he found twenty-eight entry and exit wounds on her body. The cause of death was one or more of the gunshot wounds to her head and chest.
In his defense, appellant introduced medical records that showed a quantity of alcohol in his urine when it was collected at 7:00 a.m. on September 29, 1998. However, the results of a blood alcohol test were indeterminate.
Larry Dehus, a forensic scientist, opined that Mrs. Aliff fired her weapon first and that there was then an exchange of gunfire. He based this opinion on several factors including the fact that there was gun residue on Mrs. Aliff's hand showing a defensive position and that the location of hair and tissue from an arm or leg on the television screen near the door indicated that appellant was shot when he first entered the room. Mr. Dehus also testified that he reconstructed the shot pattern of Mrs. Aliff's weapon by the string trajectory method.
Appellant did not testify.
The sentencing phase of the trial followed the jury's finding of guilt on all charges. The trial court determined that the three counts were allied offenses and the state elected for appellant to be sentenced based on the count of aggravated murder in violation of R.C. 2903.01(A). Three firearm specifications also merged. Appellant was sentenced to a term of life imprisonment without parole eligibility for the aggravated murder count and to a consecutive three year term of imprisonment for the firearm specification. He filed a timely appeal.
 II.
Appellant's first and third assignments of error allege that the jury instructions were erroneous in that the trial court failed to instruct the jury on voluntary and involuntary manslaughter. We will consider these assignments of error together due to the similarity of the issues.
An instruction on a lesser or inferior-degree offense must be given by the trial judge if there has been sufficient evidence which would allow a jury to reasonably
reject the greater offense and find the defendant guilty on a lesser included or inferior-degree offense. State v.Shane (1992), 63 Ohio St.3d 630, 632-633 (emphasis included). It is prejudicial and reversible error for a trial court to refuse an instruction on lesser included or inferior-degree offenses if the evidence could reasonably support such a verdict. State v. Carter (1996), 115 Ohio App.3d 770,773.
 A.
Voluntary manslaughter is an inferior degree of murder.State v. Rhodes (1992), 63 Ohio St.3d 613, 617, citing Statev. Tyler (1990), 50 Ohio St.3d 24, 36. "A defendant on trial for murder or aggravated murder bears the burden of persuading the factfinder, by a preponderance of the evidence, that he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, R.C. 2903.03(A), in order for the defendant to be convicted of voluntary manslaughter rather than murder or aggravated murder." Rhodes, supra, at syllabus. The defendant bears the burden of producing evidence of a mitigating circumstance in order for the jury to consider voluntary manslaughter. Id. at 619. However, the defendant can rely on evidence adduced by the prosecution to discharge this burden. Id. at 619, fn. 4.
Appellant argues that the evidence presented at trial was sufficient to meet this burden. First, appellant submits that the audio taped conversations evidence his state of rage and jealousy as well as Mrs. Aliff's opinion that appellant was not in a normal state of mind. He also argues that Mrs. Aliff's statements on the tape that appellant was under the influence of alcohol support this conclusion. Appellant further argues that he believed Homer Hager was at the marital home when he arrived and the discovery of a knife in the doorway further confirmed this belief. Lastly, appellant argues that the fact that Mrs. Aliff fired the first shot supports this instruction.
We do not agree with appellant's position that the record contains sufficient evidence to support a voluntary manslaughter instruction. In State v. Shane, supra, the Supreme Court of Ohio discussed the approach a trial court must take in determining whether a voluntary manslaughter instruction is appropriate. The Court stated that:
 An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the "* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *" must be considered. State v. Deem
(1988), 40 Ohio St.3d 205, paragraph five of the syllabus. If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.
Id. at 634.
After reviewing the audio tape, we disagree with appellant's position that it demonstrates the existence of the subjective component, i.e. that appellant was in fact acting in a sudden state of rage or jealousy. Assuming that the objective standard is satisfied, we conclude that the tape falls far short of meeting the subjective test. Appellant speaks in an even tone throughout the audio tape. He states several times and in a matter-of-fact tone that he will kill Mrs. Aliff. Furthermore, there are not one, but two different conversations on the tape in which appellant makes these statements. While Mrs. Aliff states several times that appellant will feel differently when he's sober, appellant states that he is not drunk even though he's been drinking. Appellant does not slur his words or exhibit any other signs of intoxication throughout either of the conversations. While there is evidence that there was a trace of alcohol in appellant's body when he was treated at the hospital, there is no evidence in the record that appellant's actions were caused or affected by alcohol consumption. Thus, the tape is not sufficient to establish the subjective element specified in Shane.
Appellant further argues that he was in a fit of rage because he believed Homer Hager was at appellant's residence. Assuming that the presence of Mrs. Aliff's paramour would be an objectively reasonable basis for a "fit of passion," there is no evidence in the record to support a finding that appellant harbored such a belief. Nothing in the telephone conversation between appellant and Mrs. Aliff indicated that Mr. Hager was at the home and no witnesses testified to any belief appellant had to this effect. In his brief, appellant states that the knife wedged in the door jam "was the procedure that was used by [he] and [Mrs. Aliff] to insure that they would have privacy during intimate moments." No such evidence is in the record. Anita Wippel testified that Mrs. Aliff would run the blade of a knife through the wall and the door facing to make it harder to get through the door. She did not, however, testify that this process had any special significance to appellant. Furthermore, even if she had, appellant did not discover the knife until after he broke down the front door to the home while possessing two weapons.
Lastly, appellant argues that he became enraged when Mrs. Aliff fired shots at him. Given the circumstances surrounding appellant's entry into the bedroom, no reasonable person could claim provocation as a result of being fired upon. Appellant drove to Mrs. Aliff's home where he had no legal right to be, had two firearms in his possession, broke down two different doors and did not cease his entry even after activating a loud alarm system. Given that he was unlawfully inside the home, we cannot find that a reasonable person would have been under the influence of sudden passion or in a sudden fit of rage when shots were fired at him.[1] The objective component identified in Shane
is not satisfied by this evidence.
"To require an instruction to be given to the jury every time `some evidence,' however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense." Shane, supra, at 633. While we cannot say that there is no evidence whatsoever to support such a charge, we conclude that no reasonable jury could acquit appellant of aggravated murder and find him guilty of voluntary manslaughter.
Therefore, we overrule appellant's first assignment of error.
 B.
Involuntary manslaughter, R.C. 2903.04, is, as statutorily defined, a lesser included offense of aggravated murder.[2] State v. Thomas (1988), 40 Ohio St.3d 213, syllabus at paragraph one, certiorari denied (1989),493 U.S. 826, 110 S.Ct. 89, 107 L.Ed.2d 54. "An instruction on the lesser included offense of involuntary manslaughter will be given in a murder trial only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." Id. at 216.
The primary difference between involuntary manslaughter and aggravated murder is that aggravated murder requires purpose to kill, while involuntary manslaughter requires only a killing as a proximate result of a felony. State v.Campbell (1994), 69 Ohio St.3d 38, 47. Thus, an involuntary manslaughter instruction is only justified if the jury could reasonably find that appellant killed Mrs. Aliff but did not do so purposefully. See id.
A person is presumed to intend the natural, reasonable and probable consequences of his or her voluntary acts.State v. Coulter (1992), 75 Ohio App.3d 219, 226, citingThomas, supra, at 217. "* * * Where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill." Coulter, supra, at 226, citing State v. Jester
(1987), 32 Ohio St.3d 147, 152, certiorari denied (1988),484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 871.
Based on the threats to appellant's life, the numerous entry and exit wounds and other evidence of intent, the jury could not reasonably have found that the killing of Mrs. Aliff was anything other than purposeful.
Therefore, we overrule appellant's third assignment of error.
 III.
In his second assignment of error, appellant contends that the trial court committed reversible error when it admitted State Exhibit 221, two audio taped conversations between appellant and Mrs. Aliff, into evidence. Appellant argues that the tape should not have been admitted because the state failed to establish a proper chain of custody, presented no evidence that the tape was the original recording and had not been altered, and failed to establish when the taped conversations took place.
The admission of physical evidence is a matter within the sound discretion of the trial court. State v. Kinley
(1995), 72 Ohio St.3d 491, 497. We will not reverse a decision to admit evidence unless we find that decision to be an abuse of discretion. Id.
An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary.Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.
(1992), 63 Ohio St.3d 498, 506; Wilmington Steel Products,Inc. v. Cleve. Elec. Illum. Co. (1991), 60 Ohio St.3d 120,122. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. In re Jane Doe 1
(1991), 57 Ohio St.3d 135, 138.
In order to be admissible, audio recordings must be authentic, accurate and trustworthy. State v. Gotsis
(1984), 13 Ohio App.3d 282, 203. Authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). The standard to authenticate is not rigorous and its low threshold reflects an orientation of the rules toward favoring the admission of evidence. Straitv. Baggott (Nov. 14, 1997), Montgomery App. No. 16078, unreported, citing Weissenberger's Ohio Evidence Treatise (1997), Section 901.2. Evid.R. 901(B) lists examples of authentication conforming with the requirements of the rule, but other methods are permissible and a combination of methods may also be utilized. "A reasonable account of the chain of custody of a recording is usually a necessary part of its authentication, to minimize the possibility that parts of the recording were altered or erased." Weinstein's Federal Evidence (2d.Ed. 1999) 901-939, Section901.07(3)(a).
Detective Richard Holland testified that a black tape recorder with a cassette tape on Side B was found in Mrs. Aliff's bedroom. Detective Holland brought the recorder into the kitchen and placed his initials and the date on the cassette tape. Chief Investigator Jerry Pendleton punched the tabs on the tape so it could not be recorded over. After completing a property receipt, Detective Holland turned the tape over to Investigator Timothy Sexton of the Lawrence County Prosecutor's Office.
Investigator Sexton testified that he recognized the initials "RCH" and the date "9/29/98" on the audio cassette. He further testified that he received the tape from Detective Holland at the scene of the crime, took the tape to the prosecutor's office and secured it. On October 1, 1998, Investigator Sexton transferred the tape to Investigator Jim Petri for copying and testing.
Investigator Petri confirmed that he received the tape from Investigator Sexton, made copies of Side B of the tape and turned the tape over to F.B.I. Agent Joseph Ciccarilli. Agent Ciccarilli testified that he forwarded the tape to the F.B.I. lab in Quantico, Virginia, where it was tested by Artese Kelly and then returned to Agent Ciccarilli. Agent Ciccarilli returned the tape to Detective Holland on December 1, 1998. Connie Sharp, the prosecutor's legal assistant, testified that she received the original tape and two copies from Detective Holland on December 1, 1998, and brought the tapes to the evidence room.
Clearly, the state has established the chain of custody for the cassette tape from the time it was discovered in Mrs. Aliff's bedroom. Moreover, authentication does not always require a strict chain of custody. State v. Richey
(1992), 64 Ohio St.3d 353, 360, certiorari denied (1993),507 U.S. 989, 123 L.Ed.2d 157, 113 S.Ct. 1592. Once an Item is sufficiently authenticated to be admissible, contamination of the chain of custody goes to weight rather than admissibility. Id.
Appellant further argues that the state did not provide evidence to establish that the tape recording was an original and had not been altered. Evid.R. 1002 requires that an original recording be utilized in order to prove the content of the recording unless otherwise provided by the rules. Evid.R. 1003 allows the admission of a duplicate "to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."
Appellant does not seem to argue that the tape was altered or improperly replaced with a duplicate after it was seized, but rather contends that Mrs. Aliff herself may have duplicated or altered the tape. However, the state need not rule out all possibilities, but must only demonstrate a "reasonable likelihood" that the tape is authentic. Weinstein's, supra, at 901-8 — 901-9, Section 901.02(2). Here, Mrs. Aliff's daughter testified that she recognized her mother's and appellant's voices on the recording. See Evid.R. 901(B)(5) (stating that identification of a voice through a mechanical or electronic transmission or recording by someone who has previously heard the voice is a method of authenticating or identifying evidence)
Additionally, Francisco Merced, an employee of the Tandy Corporation with an extensive electronics background, testified to the process by which the conversation was recorded. See Evid.R. 901(B)(9) (stating that "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result" is sufficient to authenticate or identify a piece of evidence). Various law enforcement officers testified that they observed the tape recorder, telephones, an adapter and a telephone recording control device in Mrs. Aliff's bedroom. The recorder was not plugged into the wall and when Detective Richard Holland attempted to play the tape, it did not work. Once the batteries were changed, the recorder played the tape.
Mr. Merced testified that the recorder was a standard, voice-activated tape recorder that would record voices and would stop recording if there were more than three minutes of silence. The adapter would plug into the wall and allow the recorder to operate without batteries. The telephone recording control would plug into a telephone socket and into the recorder. The control would activate the recorder when a sound was detected on the telephone line. It was designed to operate whenever any phone extension in the home was used.
When tested, the adapter and the telephone worked properly. The recorder functioned both with batteries and with the adapter. However, the telephone recording control did not operate properly. After further testing, Mr. Merced determined that there was an intermittent break in the wire. Therefore, when the components were hooked together no recording could be made. Mr. Merced then manually rearranged the recorder and put a slight bend in the wire at which time the system worked and a recording could be produced. He did not need to hold the wire to make a recording. Mr. Merced testified that the break in the wire could cause a recording "to cut in an[d] out. It could drop off entire portions of the recording."
Based on Mr. Merced's testimony, it is apparent that since the recording was actually produced, the equipment was working properly or the wire was sufficiently arranged such that the break in the wire was closed when the recording was made. While this may have caused "gaps" in the conversation, no "gaps" are evident from listening to the tape and the jury was capable of determining the weight to be given to the evidence based on the possibility that portions of the conversation are missing.
Also, Artese Kelly, signal processing analyst for the F.B.I., testified that she examined the tape recording. She testified that while there are tests which can determine a tape's authenticity, she cannot perform such tests. However, she testified that she noticed no obvious signs that the tape had been altered.
Even if State Exhibit 221 were a copy of a recording made by Mrs. Aliff, it would be admissible pursuant to Evid.R. 1003 unless there was a genuine question as to the authenticity of the original or it would be unfair to admit the duplicate. Here, appellant has not argued that this conversation did not take place or that the copy does not include the entire conversation recorded on the original. We see no reason why this tape would be inadmissible as it would not be unfair to appellant to admit this tape if it were a copy of the original.
Appellant also argues that the tape should not have been admitted because the state could not prove when the tape recording was made. We note, however, that the state introduced circumstantial evidence to establish when the tape was made.
Homer Hager testified that he and Mrs. Aliff were leaving the American Legion in Huntington, West Virginia, in the early morning hours of September 27, 1998, when appellant drove by. Mrs. Aliff stated, "There's Leon. Let's go back inside." Mrs. Aliff then ran back into the American Legion and Mr. Hager followed her inside. Because Mrs. Aliff was afraid to return to her home, she stayed at Mr. Hager's home and he dropped her off at approximately 11:45 a.m. on the same day. Mr. Hager testified that other than spending the night at his home on that occasion, Mrs. Aliff had never spent the night at his residence. He further testified that he picked Mrs. Aliff up at approximately 11:45 a.m. on September 28, 1998, and was with her until approximately 9:40 p.m. that evening.
In the first taped conversation, appellant makes various statements relating to the events to which Mr. Hager testified. In particular, appellant states, "If Saturday night if you'd showed up you would have died then [sic]." Mrs. Aliff responds, "That's the reason I didn't come home." Further into the conversation, appellant states, "Now, you run the other night [sic]. With a bullet, you don't run. Okay?" and "I tried to talk to you Saturday." In the second conversation, appellant states, "Like I said, I showed up the other night you run like a rabbit (UNDISCERNIBLE)."
The state also presented the testimony of Marty Stillpass, Mrs. Aliff's divorce attorney. Mr. Stillpass testified that he spoke to Mrs. Aliff the morning of September 28, 1998, that he had listened to Side A of the cassette tape at issue and that his conversation with Mrs. Aliff was recorded on that tape.
The state argues that the recorded conversations between Mrs. Aliff and appellant necessarily occurred sometime during the evening before Mrs. Aliff was murdered.
To establish that the tape is what the proponent claims it to be, namely a recording of a phone call between the victim and appellant sometime shortly before her death, the proponent need not prove beyond any doubt that the evidence is what it purports to be. Rather, the proponent must demonstrate a "reasonable likelihood" that the evidence is authentic. After the court is satisfied that this showing has been made and admits the evidence, the jury determines what weight to give the evidence. Weinstein's, supra, at 901-909, Section 901.02(2). The opposing party may introduce evidence disputing genuineness and argue the point to the jury. Id. at 901-913.
The state has not proven conclusively that the conversation did, in fact, occur the evening of Mrs. Aliff's death. The state did, however, introduce enough evidence to support a finding that the recording in question is what its proponent claims it to be. See United States v. Jimenez-Lopez
(C.A.5, 1989), 873 F.2d 769, 772 (stating that conclusive proof of authenticity is not required before allowing admission of disputed evidence). Appellant was permitted to and did, in fact, argue to the jury that the conversation did not take place when the state alleged.
In sum, we find that the state met its burden and established that the tape was authentic, accurate and trustworthy. Despite appellant's protest over the circumstances surrounding this tape's origin, the state need only prove a reasonable likelihood that the tape is what it purports to be in order to establish its authenticity. Further, it appears to be an accurate recording which includes both sides of the conversation and no obvious "gaps" which would indicate it is inaccurate. Lastly, the tape was found in circumstances which suggest it is trustworthy. Mrs. Aliff was obviously in the habit of recording her conversations. This tape appears to be one of those conversations and there is nothing to indicate it was fabricated or altered in any manner. Therefore, the decision in this case to admit the tape falls far short of an abuse of discretion.
We also note that even if the trial court erred in admitting this piece of evidence, such error was harmless beyond a reasonable doubt. The state produced other significant evidence establishing appellant's guilt.
Therefore, we overrule appellant's second assignment of error.
 IV.
In his fourth assignment of error, appellant argues that the trial court erred in admitting evidence of other bad acts committed by appellant. Specifically, appellant challenges the admission of Homer Hager's testimony regarding alleged threats made by appellant and the audio taped conversations between appellant and Mrs. Aliff.
As a general rule, evidence of prior criminal acts, wholly independent of the charge for which an accused is on trial, is inadmissible. State v. Henderson (1991), 76 Ohio App.3d 290,293, citing State v. Hector (1969), 19 Ohio St.2d 167. "Prior act" evidence is not permissible when offered to show a trait, disposition, or propensity toward the commission of a certain type of crime. Henderson, supra, at 293. Exceptions to this rule are codified in Evid.R. 404(B) which states that:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
For prior act evidence to be admissible, the evidence must be relevant to proving the guilt of the offense in question. Henderson, supra, at 294. "Further, the prior act must not be too remote and must be closely related in nature, time, and place to the offense charged." Id. If the act is too distant in time or too removed in method or type, it has no permissible probative value. Id.
Homer Hager testified to two incidents involving appellant. The first incident occurred within weeks of Mrs. Aliff's death and involved appellant's attempt to fight with Mr. Hager because Mr. Hager was with Mrs. Aliff. Mr. Hager testified that appellant then grabbed Mrs. Aliff by the throat and shoved her against a stone wall. The second incident occurred two days before Mrs. Aliff's death when appellant drove by Mr. Hager and Mrs. Aliff as they were leaving the American Legion, causing Mrs. Aliff to become frightened and retreat inside with Mr. Hager. Mr. Hager testified that appellant, then made some statements including, "Come back here, you son of a bitch."
We find that the testimony regarding these incidents was properly admitted. Under Evid.R. 404(B) prior bad acts are admissible to show motive. This testimony demonstrates that appellant was angry that his wife was involved with Mr. Hager. This anger directed at both Mrs. Aliff and Mr. Hager demonstrates that appellant had a motive to kill his wife and was, therefore, admissible under Evid.R.404(B).
Mr. Hager's testimony regarding the second incident does not describe a "bad act" by appellant. He merely described Mrs. Aliff's reaction when she saw appellant's vehicle and her fear of appellant. Furthermore, even if we believed this testimony described a prior "bad act," it would be admissible to establish the time frame in which the conversations on State Exhibit 221 took place. Evid.R. 404(B) delineates examples of instances in which prior bad acts are permissible but does not prevent other uses which are not intended to establish that the defendant acted in conformity with a certain character trait. See 1 Giannelli Snyder, Evidence (1994) 230 (stating that Evid.R. 404(B) provides a non-exclusive list of permissive uses of prior bad act evidence). In sum, neither of these incidents were used by the State to demonstrate that appellant was more likely to commit murder because of a character trait for violence.
Appellant also argues that State Exhibit 221 evidences a prior bad act and should not have been admitted under Evid.R. 404. This tape demonstrates a clear intent to kill Mrs. Aliff and shows an absence of mistake. As it qualifies under these two exceptions delineated in Rule 404(B), it was properly admitted.
Appellant further argues that even if the evidence of other bad acts is admissible under the rule, it must be excluded because its probative value is outweighed by the danger of unfair prejudice under Evid.R. 403(A). Evid.R. 403(A) states that "although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The rule favors admission unless the risk of prejudice is so substantial that a jury cannot properly evaluate it. This evidence was extremely probative of appellant's intent and motive to kill his wife and to establish the timeliness of State Exhibit 221. Its probative value is not substantially outweighed by the risk of prejudice. We do not find that the admission of this evidence confused the issues, misled the jury or was unfairly prejudicial to appellant.
We overrule appellant's fourth assignment of error.
Having found no merit in any of appellant's assignments of error, we affirm appellant's convictions.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, J. Evans, J.: Concur in Judgment and Opinion.
For the Court
 BY: ___________________________ WILLIAM H. HARSHA, JUDGE
 NOTICE TO COUNSEL Pursuant to Local Rule No. 14, this document constitutes a finaljudgment entry and the time period for further appeal commences fromthe date of filing with the clerk.
[1] We note that Mrs. Aliff was also legally entitled to defend herself in this situation. This issue was not, however, argued at trial and we will not address it here. Nor did the appellant claim self-defense.
[2] R.C. 2903.04 reads, in pertinent part:
 (A) No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony.
 (B) No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of the first, second, third, or fourth degree or a minor misdemeanor.
 (C) Whoever violates this section is guilty of involuntary manslaughter Violation of division (A) of this section is a felony of the first degree. Violation of division (B) of this section is a felony of the third degree.